JOHN AND NORMA OGIONY, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent. Ogiony v. Commissioner
Docket Nos. 1044-76, 1045-76, 1046-76, 1047-76, 1072-76.
United States Tax Court
T.C. Memo 1979-32; 1979 Tax Ct. Memo LEXIS 495; 38 T.C.M. (CCH) 125; T.C.M. (RIA) 79032; January 23, 1979, Filed Ralph J. Gregg, for the petitioners. Barry J. Finkelstein, for the respondent. *496 HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined the following deficiencies in petitioners' income tax: Petitioners
Years
Deficiency
John & Norma Ogiony
1967 $ 1,155.25
1968
6,124.90
1969
11,386.00
1970
12,180.28
1971
15,590.90
$ 46,437.33
John J. & Glorida Nasca
1971 $ 5,760.88
Joseph M. & Nancy Nasca
1971 $ 5,707.90
Edward L. & Ruth M. Ogiony
1967 $ 1,224.56
1968
6,169.24
1969
11,519.13
1970
12,910.59
1971
16,593.09
$ 48,416.61
Peter & Enis Santin
1967 $ 2,379.83
1968
13,054.69
1969
9,138.75
1970
25,622.26
1971
4,183.37
$ 54,378.90
Petitioners (or their wholly-owned corporations) were members of two partnerships, Garden Village Partnership ("Garden Partnership") and Lossen Gardens Company ("Losson Partnership"). The partnerships wanted to develop certain parcels of unimproved real estate; however, due to New York's usury law, the partnerships were unable to obtain financing. Corporations, on the other hand, were exempt from New York's usury law. Petitioners John Ogiony, Edward Ogiony and Peter Santin utilized a corporation, *497 Garden Village Builders, Inc. ("Garden Corporation"), to develop one apartment complex; petitioners John Ogiony, Edward Ogiony, Peter Santin, John Nasca and Joseph Nasca utilized another corporation, Losson Gardens, Inc. ("Losson Corporation"), to develop another apartment complex. In both instances petitioners used a corporate entity in order to avoid New York's usury law. The issues remaining for decision are: 1. Whether Garden Corporation and Losson Corporation may be disregarded for Federal tax purposes; and 2. If the corporations may not be disregarded, whether Garden Partnership and Losson Partnership had any net operating losses with respect to which petitioners are entitled to deductions. FINDINGS OF FACT
Most of the facts have been stipulated by the parties and are found accordingly. At the time they filed their petition, all petitioners resided in New York State. Petitioners Norma Ogiony, Gloria Nasca, Nancy Nasca, Ruth M. Ogiony and Enis Santin are parties only by virtue of having filed joint returns with their husbands during the years in question. When we hereafter refer to petitioners, we will be referring to John and Edward Ogiony, John and Joseph Nasca, *498 and Peter Santin. 1. Garden Village. In 1965, Mr. Alfred Stangl negotiated for and acquired from Sereth Properties, Inc. ("Sereth") an option to purchase a 48.6 acre tract of land at French and Union Roads in the Town of Cheektowaga, New York. Shortly thereafter Peter Santin became associated with Stangl and, on November 1, 1965, Garden Village Builders, Inc., ("Garden Corporation") was formed by Stangl and Peter Santin Construction Co., Inc., Santin's closely-held construction company. Garden Corporation adopted a fiscal year ending September 30. Santin and Stangl's initial endeavor--to create a townhouse community--was unsuccessful, however, and in its corporation income tax return for the fiscal year ended September 30, 1966, Garden Corporation reported a loss of $ 26,307.50 upon abandonment of its townhouse project. On May 2, 1966, Roxborough Homes Corp. ("Roxborough") acquired a one-third interest in Garden Corporation. John and Edward Ogiony ("the Ogionys") were the principal stockholders and officers of Roxborough. The acquisition by Roxborough of a stock interest in Garden Corporation was incidental to the formation of a joint venture known as "P. Santin, *499 J. & E. Ogiony, A. Stangl--Joint Venture" ("Garden Partnership"). Garden Partnership filed partnership information returns on a calendar year basis. Santin, Stangl and the Ogionys ("the Partners") [2] agreed to build rental apartments on the land on which Stangl had an option. Profit and loss from the Garden Partnership were to be shared equally, the Ogionys and Santin were to provide all funds required, and the land was to be bought in the names of and for the benefit of the Partners, individually, as tenants in common. In August 1966, Santin, Stangl and the Ogionys exercised the option on the Sereth property. They acquired the property in the following stages: Date
Acres
Purchase Price
8/15/66
11 plus
$ 110,000
8/15/66
8 plus
45,000
3/1/67
12 plus
65,000
1/15/68
16 plus
80,000
48.6
$ 300,000
In addition to the listed purchase price, they paid Sereth interest at 5 percent from October 11, 1965 to the date of closing of each purchase. When they *500 purchased 12 acres on March 1, 1967, they paid Sereth interest of $ 4,505.47 and county and school taxes of $ 561.42. When they purchased the last parcel on January 15, 1968, they paid Sereth $ 9,006.42 interest and county and school taxes totaling $ 956.50. The purchase price, closing costs and expenses incurred for the land purchase were paid either with checks drawn on the Ogionys' or Santin's personal accounts or by checks drawn on the bank accounts of Garden Partnership. Although Garden Partnership wished to develop the property, it was unable to obtain a loan because of New York's usury laws.Under section 5-501 of the New York General Obligations Law, [3] the maximum interest rate that could be charged individuals in financial transactions of the type involved in the instant case at that time was 6 percent; anything over 6 percent was usurious. Section 5-501 was amended in 1968 to allow, in effect, a maximum interest rate of 7 1/2 percent, and in 1973 a maximum interest rate of 8 percent. Corporations, however, were not able to interpose a defense of usury. Santin approached Western Savings Bank ("Western"), with which he had dealt for many years, and requested a loan on *501 behalf of Garden Partnership; this request was denied. In essence, Santin was informed that because of a "money crunch" loans at 6 percent interest (the maximum rate allowable for individual and, hence, Garden Partnership) were unavailable; Santin was informed that loans on investment property were limited to loans to corporations. Since neither the Partners nor Garden Partnership could obtain the financing necessary for the apartment project, the Partners decided to "go the corporate route." The Partners decided to use Garden Corporation, which was inactive by this time, [4] since Western preferred a corporate borrower which was already in existence to a new "shell" corporation formed for that purpose. In fact, the suggestion that Garden Corporation should be the borrower originated with Mr. Frantzen, an officer at Western, who believed that the Partners were already shareholders of Garden Corporation. [5]
*502 A special meeting of the board of directors of Garden Corporation was held on March 24, 1967. The subject of discussion was the problem of financing the construction of apartments on the tract owned by Garden Partnership. It was reported to the meeting that "the Western Savings Bank was not interested" in advancing the mortgage money to the individuals because of "the going interest rate that could be charged to corporations." The following two motions were passed: (1) That the individuals convey to this Corporation a portion of the land held by them as individuals so that the Corporation would be the title owner, which would be done solely for the purpose of obtaining from the Western Savings Bank a $ 720,000 mortgage for apartment construction on the premises, with interest at the rate of 6-1/2% per annum, which rate could not be obtained by the parties as individuals. (2) During the term of the building loan advances under said $ 720,000 mortgage, the property would continue to remain in the corporate name until such time as the final draw had been obtained by the Corporation and the permanent mortgage was then placed against the said property. At that time the Corporation *503 would re-convey the subject premises to the respective parties, or their assigns with an assumption of the $ 720,000 mortgage by the Western Savings Bank, it being understood that this transaction is being done solely for the purpose of obtaining the financing from the Western Savings Bank at the interest rate as requested by them. That other than this transaction, it was generally agreed that the Corporation was to remain in an inactive status. It was further agreed that none of the $ 720,000 proceeds shall in anywise be used by the Corporation for any corporate obligations, but shall be used strictly for the construction of the apartments and pursuant to the terms of the mortgage, and for no other reason. On the same date, Western issued a commitment letter for a $ 720,000 mortgage loan to Garden Corporation payable over a 25-year period with interest at 6 1/2 percent per annum, the purpose of the loan being to finance nine eight-unit brick apartments and 72 garages on two parcels totaling 4.93 acres of the tract the Partners had acquired from Sereth. On August 11, 1967, the Partners conveyed their undivided interests in the two parcels of land described in the commitment *504 letter to Garden Corporation. On the same day Garden Corporation executed and recorded a mortgage for $ 720,000 to Western. During the ensuing four years, the Partners deeded to Garden Corporation the various parcels of land and all improvements thereon and they executed various 8ortgages to Western covering all fixtures permanently attached to the property. The Partners believed that they owned all fixtures not permanently attached. A summary of the dates of transfer, the acreage transferred by the Partners to Garden Corporation, and the amount of each mortgage is set forth below: Date
Acres
Mortgage
Interest Rate
8/11/67
4.93 $ 720,000
6 1/2%
9/20/68
4.03
600,000 [6]
7 1/2%
4/10/69
3.21
740,000
8%
5/10/70
1.41
345,000
9 1/2%
12/14/70
1.39
489,000
9 1/2%
6/1/71
2.23
585,000
8 3/4%
17.20
$ 3,479,000 [7]
On August 1, 1972, Western issued a commitment letter to Garden Corporation for a conventional permanent *505 consolidation of all of the above loans in the amount of $ 3,600,000 at 8.2% interest. Although Garden Corporation was the mortgagee of record for all mortgage loans obtained from Western, on two occasions Garden Corporation transferred title of a portion of the land which it owned back to the Partners.On January 2, 1968, Garden Corporation deeded 4.93 acres back to the Partners; the land was reconveyed to Garden Corporation on January 23, 1968. On December 17, 1968, Garden Corporation conveyed back title to the same 4.93 acres; this same parcel was reconveyed to Garden Corporation on April 10, 1969. Garden Corporation owned the following percentages of the land during the years listed: Year
Percentage Owned
1967
6.0%
1968
11.5%
1969
20.7%
1970
27.0%
1971
30.6%
Although all the loans from Western were made to Garden Corporation, the corporation's shareholders intended at all times that Garden Corporation would be nothing more than a financing vehicle. Santin, Stangl and the Ogionys did not intend to have Garden Corporation take over the apartment project; rather, they viewed the development project as strictly a personal investment. [8] All draws *506 on the mortgage loans from Western were transferred by Garden Corporation, either by check or by endorsement, to the construction account of Garden Partnership. All rental income from the apartments was deposited in Garden Partnership's rental account; the leases listed Garden Partnership as lessor. However, the Partners obtained the benefit of financing from using Garden Corporation in this transaction. Apartment houses were built on the land. The construction and related activities were under the supervision of Santin and the Ogionys. The individual partners--as well as their suppliers--viewed the liabilities incurred in the course of the construction project as the individuals' personal liabilities. All of the expenses [9] incurred in connection with the development and operation of the Garden Village Apartments were paid either by the Partners or by Garden Partnership. Income received and expenses incurred by the Partners and Garden Partnership during the years in issue were as follows: *507 Year
Amount
1967
INCOME
none
EXPENSES
Interest
Sereth Properties $ 4,809.38
Western Savings
2,902.57
Manufacturers' & Traders' Trust
2,957.55
Realty Taxes [10]
1,744.24
Telephone
20.09
Bank Service Charges
1.00
Advertising
1,314.70
Office Expense
113.52
1/1/68 thru 9/30/68 [11]
INCOME
Rent
$ 45,061.00
Common land sale
4,528.88
EXPENSES
Realty Taxes
7,738.35
Interest
44,905.23
Commission
5,875.60
Telephone
403.13
Utilities
2,825.13
Supplies
157.96
Repairs
294.25
Maintenance
2,209.78
Insurance
2,089.65
Office Supplies [12]
301.36
Wages
1,187.50
Legal and Accounting
425.00
Miscellaneous
995.89
Advertising
484.08
Equipment Rental
81.32
Payroll Taxes
52.25
10/1/68 thru 12/31/68
INCOME
Rent $ 33,350.00
EXPENSES
Interest
23,080.02
Accounting Fee
150.00
Payroll Taxes
93.95
Commissions
2,340.50
Telephone
141.31
Utilities
2,501.33
Maintenance
2,136.45
Wages
1,348.33
Miscellaneous
207.36
Insurance
1,203.96
Supplies
149.41
1969
INCOME
Rental Income
$ 243,142.56
Machine Income [13]
803.00
Other Income
375.84
EXPENSES
Interest
115,635.27
Real Estate Taxes
22,445.73
Commissions
14,807.00
Wages
5,200.00
Payroll Taxes
427.02
Insurance
6,087.70
Legal Fees
131.00
Accounting
1,800.00
Telephone
809.22
Utilities - Gas
10,905.73
- Electric
5,513.04
- Water
3,231.92
Maintenance
16,903.95
Pool Expense
3,510.25
Office Expense
1,036.97
Gasoline and Oil
342.55
Miscellaneous Expense $ 1,472.12
Advertising
571.20
Dues & Subscriptions
250.00
Repairs
215.52
Bank Service Charges
36.98
Amortization of Mortgage Costs
690.51
1970
INCOME
Rental Income
$ 398,421.44
Machine Income
3,155.55
EXPENSES
Interest
178,322.77
Real Estate Taxes
44,084.11
Commissions
15,578.75
Wages
16,095.05
Payroll Taxes
975.68
Insurance
7,687.78
Legal and Accounting
1,638.40
Telephone
1,322.57
Utilities - Gas
18,499.56
- Electric
10,883.19
- Water
7,258.46
Maintenance
14,775.15
Pool Expense
1,661.31
Gasoline and Oil
1,200.30
Miscellaneous Expense
3,438.83
Advertising
281.25
Dues & Subscriptions
95.00
Repairs
1,503.20
Bank Service Charges
67.10
Amortization of Mortgage Costs
1,522.38
Office Supplies
313.08
Supplies
1,992.72
Contributions
375.00
Travel Expense
114.00
1971
INCOME
Rental
$ 481,405.99
Interest
609.28
Other
7,353.09
EXPENSES
Interest [14]
234,138.68
Real Estate Taxes
70,380.76
Commissions
18,330.00
Wages
23,883.49
Payroll Taxes
1,687.70
Insurance
7,369.06
Legal and Accounting
2,775.00
Telephone
1,518.66
Utilities - Gas
25,209.46
- Electric
13,186.34
- Water
8,864.98
Maintenance
11,819.53
Pool Expense
424.31
Gasoline and Oil
1,293.25
Miscellaneous
1,255.32
Advertising
585.49
Dues and Subscriptions
96.75
Repairs
7,504.10
Bank Service Charges
80.41
Amortization Mortgage Cost
1,993.43
Office Supplies
628.23
Supplies
10,020.11
Contributions
1,152.50
Postage
70.00
*508 *509 In addition to the expenses listed above, Garden Partnership purchased various assets, including equipment, and machines, which it used in connection with its own activities as well as the operation of the apartment project. The only assets for which title was transferred to Garden Corporation were parcels of land and improvements thereon. During the years in issue, Garden Partnership claimed depreciation on assets as follows: Year
Assets
Depreciation
1967
None
None
1/1/68 -
Buildings $ 9,706.75
9/30/68
Snowblower and Lawnmower
27.79
Adding Machine
8.09
Garbage Containers
48.13
Office Furniture
4.15
Rugs
2,118.12
Appliances
1,487.88
Hot Water Tanks
135.00
Parking Lots
1,751.40
10/1/68 -
12/31/68
Buildings
9,561.15
Snowblowers and Lawnmowers
27.79
Adding Machine
8.09
Garbage Containers
73.13
Office Furniture
4.15
Car Radio
58.05
Office Building & Warehouse
180.62
Rugs
1,985.72
Appliances
1,413.49
Hot Water Tanks
128.25
Parking Lots
1,663.83
1969
Buildings
66,962.96
Snowblowers and Lawnmowers
111.15
Adding Machine
32.37
Garbage Containers
328.54
Office Furniture
16.61
Car Radio
232.21
Office Furniture $ 7.80
Office Building & Warehouse
722.48
Rugs
17,391.08
Appliances
11,417.56
Hot Water Tanks
1,270.36
Parking Lots
10,023.81
1970
Buildings
100,328.96
Rugs
22,609.82
Appliances
16,990.99
Hot Water Tanks
2,059.93
Parking Lots
12,993.59
Additions
8,286.21
Recreation Building
3,022.28
Snowblowers and Lawnmowers
111.15
Adding Machine
32.37
Garbage Containers
436.66
Office Furniture
56.35
Car Radio
232.21
Office Building & Warehouse
722.48
Copy Machine
16.85
Typewriter
4.71
Litter Vacuum
22.55
Pool Table-Rec. Hall
10.50
Dodge Truck [15]
272.26
Dumpsters
108.29
1971
Buildings
84,090.06
Rugs
18,279.25
Appliances
14,595.60
Hot Water Tanks
1,842.31
Parking Lots
9,503.38
Additions
7,026.99
Recreation Building
5,863.83
Snowblowers and Lawnmowers
111.15
Adding Machine
32.37
Garbage Containers
436.66
Office Furniture
56.35
Car Radio
232.21
Office Building & Warehouse
722.48
Copy Machine
22.47
Typewriter
9.42
Litter Vacuum
45.10
Pool Table-Rec. Hall
42.00
Dodge Truck
1,089.06
Dumpsters
275.87
Furniture-model apartments
282.75
Sign
13.30
*510 During the years in issue, Garden Corporation reported no income, and it claimed deductions for expenses as follows: Fiscal Year Ended
Expense
Amount
9/30/67
Bank Charges $ 2.00
Other (unlisted)
22.50
9/30/68
Bank Charges
10.00
Franchise Taxes
25.00
Accounting Fees
125.00
9/30/69
Bank Charges
23.20
Franchise Taxes
81.25
9/30/70
Bank Charges
17.11
Franchise Tax
100.00
9/30/71
Bank Charges
.50
Franchise Tax
118.75
In his statutory notice, respondent disallowed the distributive shares of operating losses claimed by the individual partners for 1967 through 1971 on the ground that the losses belonged to Garden Corporation. Respondent did not cite any section of the Internal Revenue Code as the basis for his determination in the notices. 2. Losson Gardens
Losson Gardens Company ("Losson Partnership") was a joint venture organized in 1969 by Peter Santin Construction Co., Inc., Roxborough Homes Corp. and John and Joseph Nasca. The partnership adopted a fiscal year ending September 30. [16] The purpose of this partnership was to purchase *511 land and build apartments on Losson Road in Cheektowaga. On July 1, 1969, Losson Partnership purchased 36.02 acres of land on the north side of Losson Road. On January 6, 1971, Losson Partnership acquired a contiguous parcel of land 3 acres from a local school district. Losson Gardens, Inc. ("Losson Corporation") was incorporated on August 12, 1969. The partners in Losson Partnership formed the corporation solely to satisfy bank requirements for obtaining a loan.Losson Partnership had to transfer title of parcels of land which it wished to develop to the corporation in order to receive financing. On June 10, 1968, Losson Partnership conveyed 2.74 acres to Losson Corporation; on August 24, 1971, 3.15 acres were conveyed by the partnership to the corporation; and on October 21, 1971, an additional 2.82 acres were conveyed to the corporation. Losson Corporation owned 7.9% of the land in 1971. Mortgages on the property conveyed by Losson Partnership to Losson Corporation were obtained from Western. The following mortgage loans were received by Losson Corporation from Western: Date
Amount
6/12/70
$ 530,000
8/24/71
672,000
10/20/71
467,000
*512 All draws received from Western were in the form of checks payable to Losson Corporation. These checks were either deposited in Losson Corporation's checking account, with checks being drawn against these deposits to Losson Partnership, or the checks were endorsed over to the partnership and deposited in its construction account. Title to the entire tract, other than portions conveyed to Losson Corporation, was retained by Losson Partnership during the year in issue. All of the expenses incurred in connection with development of the Losson Garden Apartments, and all rents therefrom, were in the name of Losson Partnership. The partnership also incurred its own expenses. [17] The expenses and income of Losson Partnership for its fiscal year ended September 30, 1971, were as follows: Income
Rental Income
$ 43,750.22
Misc. Receipts
1,006.90
Expenses
Interest Cost
64,495.55
Real Estate Taxes
3,882.88
Amortization of Mortgage Fees
218.95
Rental Commissions
6,906.49
Office Expenses
590.30
Utilities & Services
5,732.32
Supplies, Repairs & Maintenance
3,390.03
Insurances
2,589.25
*513 In its partnership information return for its fiscal year ended September 30, 1971, Losson Partnership claimed depreciation deductions as follows: Depreciation of Buildings
$ 14,642.16
Depreciation of Furniture
and Fixtures
5,593.06
Depreciation of Parking Lot
1,122.82
Depreciation of Machinery
and Equipment
199.50
On their returns, the Ogionys, the Nascas and Santin claimed distributive shares of the net operating loss which Losson Partnership had reported for its fiscal year ended September 30, 1971. In the statutory notices respondent disallowed these claims on the grounds that the losses belonged to Losson Corporation. Respondent did not cite any section of the Internal Revenue Code in his statutory notices as the basis for his determinations. OPINION The first issue for decision is whether Garden Corporation and Losson Corporation may be disregarded for Federal tax purposes. Petitioners' position is generally that the corporations should be ignored. Respondent, on the other hand, contends that we should follow our recent decision in Strong v. Commissioner,66 T.C. 12 (1976), affd. without published opinion (2d Cir. Feb. 14, 1977), *514 and recognize the corporations as owners of the property transferred to them. We agree with respondent.
The facts in this case are virtually identical to those presented in Strong,supra. Economic conditions pushed the market rate of interest above the New York usury law limit of 6 percent. Petitioners (or their wholly-owned corporations) were members of two partnerships, Garden Partnership and Losson Partnership. Petitioners desired to improve certain properties with apartment buildings. Due to New York's usury law they were unable to obtain financing in their individual capacity or through their partnerships. Corporations, however, are unable to interpose a defense of usury in New York. Accordingly, petitioners used two corporations, Garden Corporation and Losson Corporation, as corporate borrowers in order to obtain the funds which the partnerships needed to construct the apartment building. As a precondition to obtaining the desired mortgage construction loans, the corporations had to own the property which was to be developed. For most of the time during the years in question, title to the developed portions of the land remained in the corporations. The partnerships *515 collected all rent and paid all expenses connected with the operation of the apartment complexes; the partnerships also retained title to some undeveloped land. [18] On their partnership information returns the partnerships reported the rent as income and deducted all expenses related to the apartment complexes, including interest, taxes, depreciation, wages, etc. Petitioners then claimed net operating losses in the amounts of their individual shares of the partnerships' reported losses. [19] Respondent determined that all income and deductions properly belonged to the corporations, not the partnerships, and respondent disallowed the claimed net operating losses. *516 Petitioners present three arguments as the basis of their contention that the corporations should be disregarded for tax purposes. They contend, first, that Strong v. Commissioner,supra, was wrongly decided; second, that the corporations were their agent or nominee and, accordingly, should be disregarded; and, third, that since all income was received by and expenses of the apartment complexes were paid by the partnerships, they are entitled to the net operating losses. As to petitioner's first contention, that Strong was wrongly decided, we disagree. Strong is a reviewed opinion which was approved without dissent. We follow that decision here. See also Collins v. United States,386 F. Supp. 17 (S.D. Ga. 1974), affd. per curiam 514 F. 2d 1282 (5th Cir. 1975). Petitioners' second contention is that the corporations were merely their agents or nominees. Although their brief is not clear on this point, petitioners appear to argue that the corporations were, at best, mere conduits for the activities of the partnerships. But it has been held by the Supreme Court that a taxpayer who utilizes, and obtains the economic *517 benefit of, the corporate form may not evade the tax consequences thereof by the characterization of the corporation as merely an agent. Moline Properties v. Commissioner,319 U.S. 436 (1943); National Carbide Corp. v. Commissioner,336 U.S. 422 (1949). [20] Similarly, in Strong v. Commissioner,supra, we specifically rejected the argument that the corporation was "a mere tool or conduit." 66 T.C. at 21. Our determination that Strong is controlling here requires us to reject petitioners' contention that the corporations herein be treated as mere nominees. Petitioners' third contention is that they are entitled to the net operating losses since all rental income was received by and all expenses of the apartment complex were paid by the partnerships. We recently considered these arguments in another context in Klausner v. Commissioner, T.C. Mmeo. 1978-405 (October 11, 1978), 37 T.C.M. 1688, 47 P-H Memo. T.C. par. 78,405 (1978). In Klausner, *518 on similar facts, respondent determined that rents received by the taxpayers constituted dividends to them from their corporation. We held that the corporation lacked earnings and profits and, hence, that the rents could not be treated as dividends. [21] We also held that the rents should be treated as paid to the Corporation and used by it to pay corporate expenses. At least to the extent of expenses paid by the shareholder, the cash received should be treated as a reimbursement by the Corporation of an advance made by the shareholder. * * * [The excess of the taxpayer's expenditures over rent received should be] treated as a contribution to the capital of the Corporation and as being at least part of the basis for [the taxpayer's] interest in the Corporation * * *. In view of the foregoing, we conclude that none of the [rent] should be treated as a dividend to [the taxpayer] during 1973. By the same token, the excess amount of expenses * * * should not be treated as a loss * * *. We concur in Klausner's *519 resolution of the problem of the treatment of rents and expenses. As the owners of the property, the corporations were the proper parties to take the rents into income. Although the partnerships received the rent and paid the expenses, the rents are not income to them and the excess of their payments from their own funds, if any, over rents constitutes a contribution to the capital of the corporations. The next issue is whether the partnerships had net operating losses with respect to which petitioners are entitled to deductions. Petitioners contend, first, that they are entitled to all their claimed deductions since respondent's determinations were an arbitrary and capricious application of section 482. Second, petitioners contend that respondent has issued private letter rulings allowing other taxpayers the deductions petitioners claim here. Finally, petitioners contend that they are entitled to some of the deductions which respondent determined were the corporations'. The basis for petitioners' final position is that not all of the partnerships' property was transferred to the corporations. Although we disagree with petitioners' first two contentions, we agree with their *520 final contention in part. Petitioners' first contention, that respondent's determinations were an arbitrary application of section 482, is without merit since respondent's determination in this case did not rest on section 482. Rather, respondent's determinations were based on the fact that the corporations were the legal owners of the apartment complexes and, hence, should report all income and deductions with respect thereto. Petitioners were well aware of this since their requests for admissions that section 482 was the basis of respondent's determinations were repeatedly denied. Nevertheless, petitioners ask us to look "behind" the statutory notices issued to them; they stress that prior correspondence from respondent indicated that respondent was relying on section 482. It is well established, however, that this Court generally will not look behind the statutory notice. Greenberg's Express, Inc. v. Commissioner,62 T.C. 324, 327 (1974); Branerton Corp. v. Commissioner,64 T.C. 191, 200 (1975). We see no reason to depart from that practice *521 here. Petitioners' second contention, that they are entitled to rely on private letter rulings issued to other taxpayers, is equally meritless. It is well settled that "where the Commissioner has issued a private ruling to one taxpayer, another taxpayer )who has not received a ruling) may not rely on the holding in the issued ruling so as to require that he be given the same treatment that the first taxpayer was accorded." Teichgraeber v. Commissioner,64 T.C. 453, 456 (1975); TennesseeNatural Gas Lines, Inc. and Subsidiary v. Commissioner,71 T.C. No. 7 (October 30, 1978). No exception to this rule is applicable here. See International Business Machines Corp. v. United States,343 F. 2d 914 (Ct. Cl. 1965). Moreover, there is no evidence that petitioners relied on these private rulings. Petitioners' final contention is that they are entitled to some of the deductions allocated by respondent to the corporations since not all of the partnerships' properties were transferred to the corporations. *522 The questions petitioners have raised are purely factual, and the burden of proof is on them. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
Generally, to be deductible an expense must be incurred in a taxpayer's own trade or business. Interstate Transit Lines v. Commissioner,319 U.S. 590 (1943); Columbian Rope Co. v. Commissioner,42 T.C. 800, 815 (1964). In this case, petitioners contend that they are entitled to deduct all the expenses they paid in connection with operation of the apartment complexes. However, we have already concluded that the corporations were the proper parties to include the rents as income. Consequently, only the corporations are entitled to deduct expenses related to the production of this rental income. Respondent disallowed the partnerships' claimed deductions solely on the grounds that the corporations, as owners of the property, were the proper parties to claim the deductions. On brief, respondent notes *523 that "respondent's position in this case is limited to periods of actual corporate ownership of the property involved." Turning to the specific expenses which the partnerships claimed were deductible during the years in issue, we conclude that these can be separated into several classifications: (1) items deductible only by the corporations; (2) items deductible only by the partnerships; (3) real estate taxes; (4) interest; and (5) depreciation. 1. Items deductible only by the corporations.In light of all the evidence in this case, we conclude that the following expenses were solely related to the operation of the apartment complexes and, accordingly, must be deducted by the corporations for all the years in issue: commissions, wages, payroll taxes, insurance, utilities (except telephones), maintenance (listed as supplies, repairs and maintenance by Losson Partnership), pool expense, gasoline & oil, miscellaneous, advertising, dues and subscriptions, repairs, amortization of mortgage costs, and supplies (except office supplies). Although the corporations transferred some of their property back to the partnerships for brief periods in 1968 and 1969, we must deny deductions *524 for these expenses is their entirety for all the years at issue. Deductions are a matter of legislative grace, New Colonial Ice Co., Inc. v. Helvering,292 U.S. 435 (1934), and petitioners bear the burden of proving that they are entitled to their claimed deductions. Welch v. Helvering,290 U.S. 111 (1933); Rockwell v. Commissioner,512 F. 2d 882 (9th Cir. 1975), rehearing denied June 13, 1975, cert. denied 423 U.S. 1015 (1975). Respondent does not contend that petitioners are not entitled to the deductions for the periods when they owned the property.Petitioners, however, have failed to present us with any means to allocate these expenses for the periods that the partnerships owned a portion of the developed property. Accordingly, they have failed to carry their burden of persuasion, and we must deny the claimed deductions. 2. Items deductible only by the partnerships. In light of all the evidence presented, we conclude that petitioners have carried their burden of proving that the following expenses of the partnerships *525 are deductible by them: legal and accounting, telephone, bank service charges, office supplies and office expenses, travel expenses, contributions and postage. Respondent has not challenged these claimed deductions on any other grounds, including substantiation of the claimed deductions. 3. Real estate taxes.Only the owner of property may deduct real estate taxes. Section 1.164-6(a), Income Tax Regs. We have found that the partnerships paid real estate taxes as follows: Year
Partnership
Taxes
1967
Garden Partnership
$ 1,744.24
1968
Garden Partnership
7,738.35
1969
Garden Partnership
22,445.73
1970
Garden Partnership
44,084.11
1971
Garden Partnership
70,380.76
1971
Losson Partnership
3,882.88
The partnerships paid the real estate taxes on the entire tracts, including the lands (and improvements thereon) transferred to the corporations. We concluded that the corporations owned the percentages of the tracts as follows: Year
Corporation
Percentage Owned [22]
1967
Garden Corporation
6.0%
1968
Garden Corporation
11.5%
1969
Garden Corporation
20.7%
1970
Garden Corporation
27.0%
1971
Garden Corporation
30.6%
1971
Losson Corporation
7.9%
*526 The remainder of each tract, for which the partnerships paid real estate taxes, were owned by the partnerships. At first blush, it appears that we should simply allocate real estate taxes paid on the basis of percentage ownership of the land; i.e., since Garden Partnership owned 94 percent of the land in 1967, it should be entitled to deduct 94 percent of the real estate taxes. The problem with this approach, however, is that it does not recognize that the portion of the land owned by the corporations was developed and, hence, taxed at a higher rate. Garden Partnership is entitled to deduct the real estate tax on the undeveloped portion of the property. We do know, however, that Garden Partnership's property was subject to real estate taxes of $ 58.14 per acre in its undeveloped state. The total tax on 48.6 acres of undeveloped land would have been $ 2,825.67 in 1967. Since petitioners have not presented any evidence proving that real estate taxes *527 increased during the years in issue, we conclude, on the basis of the burden of proof, that this amount ($ 2,825.67) represents the real estate tax on the entire tract in its undeveloped state during the years in issue. Accordingly, Garden Partnership is entitled to real estate tax deductions during the years in issue as follows: Year
Deduction
1967
$ 1,639.59
1968
2,500.72
1969
2,240.76
1970
2,062.74
1971
1,961.02
As to the tract of land owned by Losson Partnership and Losson Corporation, we have no evidence of the real estate taxes on that land in its undeveloped state.We know, however, that Losson Partnership owned 92.1 percent of the 36-plus acres of the tract. We also know that Garden Partnership paid $ 58.14 tax per acre of undeveloped land. Making an approximation, Cohan v. Commissioner,39 F. 2d 540, 544 (2d Cir. 1930), we conclude that real estate taxes on the entire tract in its undeloped state were $ 2,093 and, accordingly, Losson Partnership is entitled to deduct $ 1,927.65 4. Interest.Interest is generally deductible. Section *528 163. The taxpayer, however, must own the property subject to a mortgage to deduct mortgage interest. Section 1.163-1(b), Income Tax Regs. In this case, with respect to the mortgages obtained by Garden Corporation and Losson Corporation on the land which the corporations developed, petitioners (and their partnerships) were not owners of the property. With the exception of interest paid by Garden Partnership in 1967 and 1971, petitioners have presented no evidence establishing that either partnership paid interest to anyone other than Western. [23] We conclude that petitioners have failed to carry their burden of proving that they are entitled to any interest deductions with respect to payments by Garden Partnership in 1968, [24] 1969 and 1970, and with respect to interest payments by Losson Partnership in 1971. *529 As to Garden Partnership's interest payments in 1967 and 1971, in 1967 Garden Partnership paid Western $ 2,902.57, Sereth $ 4,809.38, [25] and Manufacturers' and Traders' Trust Company ("Manufacturers") $ 2,957.55. The interest paid to Western and Manufacturers is not deductible, since both obligations were corporate obligations. [26] The interest paid Sereth in 1967 was on the obligation arising from the purchase of the original 32 acres. We held, above, that Garden Partnership owned a total of 94 percent of that property during 1967 and, correspondingly, Garden Partnership is entitled to deduct 94 percent of the interest paid to Sereth in that year, or a total of $ 2,728.42. In 1971 Garden Partnership paid interest of $ 916.65 to Peter Santin Construction Company, Inc., $ 916.65 to Roxborough Homes, Inc., and $ 568.75 to Manufacturers. The remaining interest was apparently paid to Western.For reasons discussed above, Garden Partnership is not entitled to the claimed interest deduction for the interest paid to Western and Manufacturers, but the partnership is entitled to deduct the interest paid to Peter Santin Construction Company, Inc. and Roxborough Homes, Inc.[27]
*530 5. Depreciation.Section 167 allows a deduction for depreciation; in general, only the holder of an economic interest in property may deduct depreciation.See Hunter v. Commissioner,46 T.C. 477, 489-490 (1966). In this case, the partnerships claimed depreciation deductions for many assets, including improvements on land which had been transferred to the corporations. We conclude that the partnerships are not entitled to depreciation deductions for any of the buildings (including the office building, warehouse, and recreation building) or the fixtures [28] attached thereto, including rugs, appliances, and hot water tanks. [29] We further hold that the partnerships are not entitled to deduct depreciation on the parking lots, since petitioners have failed to carry their burden of proving that the land underlying the parking lots was not transferred to the corporations. [30] The partnerships are entitled to deduct claimed depreciation on the following assets: [31]
*531 Year
Partnership
Assets
1968
Garden Partnership
snowblower and lawnmower
adding machine
garbage containers
office furniture
car radio
1969
Garden Partnership
same as 1968
1970
Garden Partnership
same as 1969, plus
copy machine
typewriter
litter vacuum
pool table
Dodge truck
dumpsters
1971
Garden Partnership
same as 1970, plus
furniture--model apartment
sign
1971
Losson Partnership
machinery and equipment
Decision will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith for purposes of trial, briefing and opinion: John J. and Gloria Nasca, Docket No. 1045-76; Joseph M. and Nancy Nasca, Docket No. 1046-76; Edward L. and Ruth M. Ogiony, Docket No. 1047-76; and Peter and Enis Santin, Docket No. 1072-76.↩
2. Stangl was bought out of the Garden Partnership in 1968; he is not a party to this case. The official name of the partnership was changed to "P. Santin, J. & E. Ogiony-- Joint Venture."↩
3. N.Y. Gen. Oblig. Law, sec. 5-501↩ (McKinney 1964).
4. Although Garden Corporation was inactive, minutes for annual meetings of the shareholders and directors of the corporation were prepared for 1965 through 1978. The minutes for 1970 and 1971 were not signed. ↩
5. In fact, Stangl, Roxborough and Peter Santin Construction Company, Inc. were shareholders; Santin and the Ogionys were only indirect shareholders of Garden Corporation.↩
6. The amount of this mortgage was increased to $ 650,000 at 7 3/4% interest by an instrument executed April 10, 1969. ↩
7. The total was increased to $ 3,529,400 due to the increase explained in note 6 supra.↩
8. In addition, the Partners loaned their personal funds to Garden Partnership; Partners' loans outstanding as of December 31, 1971, totaled $ 166,411.94.↩
9. The parties set forth in the Stipulation of Facts an exhaustive catalog of the expenses incurred by Garden Partnership. All↩ expenses connected with this real estate project, as well as any other expenses of Garden Partnership on its own behalf, were paid by the partnership. Expenses incurred by the partnership on its own behalf included legal and accounting fees, telephone charges, bank service charges, office supplies, travel expense, contributions and postage.
10. Real estate taxes paid of $ 1,744.24 represent tax on 20 acres of undeveloped land for the entire year and 12 acres for 5/6 of the year. This equals a tax rate of approximately 58.14 per acre of undeveloped land per year. Accordingly, the real estate taxes for 48.6 acres of undeveloped land would have been $ 2,825.67. There is no evidence in the record that taxes on unimproved real estate increased during the years in issue. ↩
11. Garden Partnership filed partnership information returns for the period 1/1/68 thru 9/30/68 and 10/1/68 thru 12/31/68 because Stangl left the Partnership on September 30, 1968. ↩
12. An office was maintained by Garden Partnership at the apartment complex. ↩
13. Although Garden Partnership reported income with respect to its washers and dryers, there is no evidence in the record as to costs associated with, or the basis of, such machines. ↩
14. Of this interest, $ 916.65 was paid to Peter Santin Construction Company, Inc., $ 916.65 was paid to Roxborough Homes, Inc., and $ 568.75 was paid to Manufacturers' and Traders' Trust Company ("Manufacturers'"). Garden Partnership had borrowed from Peter Santin Construction Company, Inc. and Roxborough. Garden Corporation had borrowed $ 30,000 from Manufacturers' as part of its townhouse project.↩
15. The truck was used for maintenance of the apartment complex grounds.↩
16. The sole year at issue here is the fiscal year ended September 30, 1971.↩
17. Losson Partnership's expenses were the same as expenses of Garden Partnership.↩
18. Neither party emphasized that Santin and the Ogionys, not Garden Partnership, acquired the tract from Sereth. For the purpose of determining Garden Partnership's net operating losses during the years in issue, we have treated the partnership as the owner of the property not transferred to Garden Corporation. ↩
19. In fact petitioners John Ogiony, Edward Ogiony and Peter Santin were not↩ partners in Losson Partnership; their wholly-owned corporations were partners. Respondent, however, did not base his determination on this fact, and respondent presented no argument that these individuals were not entitled to the claimed deductions on these grounds. Accordingly, for purposes of this opinion we have treated these individuals as partners in the Losson Partnership.
20. See Jones v. Commissioner,T.C. Memo. 1978-446↩ (November 7, 1978), 37 T.C.M.    , 47 P-H Memo. T.C. par. 78,446 (1978).
21. Although respondent did not make such a determination here, the same result would occur, since both corporations herein have always operated at a loss.↩
22. For example, if 5 percent of a given piece of land was transferred on July 1 of a given year, the corporation would own 5 percent of the land for 50 percent of the year, or 2.5 percent of the land for the entire year.↩
23. We lack any means to allocate interest deductions to petitioners for the periods in 1968 and 1969 in which they owned some of the developed property. ↩
24. In 1968 the Partners paid Sereth interest of $ 9,006.42 in connection with the purchase of 16 acres of land. This interest, at 5 percent from the date the option was obtained to the date of closing, was part of the cost of acquisition of the property. Such interest is not deductible but, rather, is added to their basis in the property. Joell Company v. Commissioner,41 B.T.A. 825, 827 (1940); Goddard v. Commissioner,21 T.C.M. 419↩, 31 P-H Memo. T.C. par. 62,083 (1962).
25. This does not include interest of $ 4,505.47 paid in connection with the acquisition of 12 acres from Sereth in 1967 which must be added to the Partners' basis in the property. See note 24 supra.↩
26. When Garden Corporation attempted to construct townhouses in 1965-1966, it borrowed $ 30,000 from Manufacturers. ↩
27. We note, again, that respondent presented no reason for disallowing this interest deduction other than the argument that Garden Corporation was liable on the indebtedness. We found as a fact that Garden Partnership borrowed from Peter Santin Construction Company, Inc. and Roxborough Homes, Inc.↩
28. Losson Partnership claimed a depreciation deduction for "furniture and fixtures" in 1971. This deduction is disallowed in its entirety, since petitioners have not proved what portion, if any, of the claimed deduction was allocable to furniture.↩
29. Under New York law, fixtures "are articles which were personalty but which by being annexed to realty are regarded as a part thereof." In re Lido Beach Sewage Collection District,40 Misc. 2d 384, 243 N.Y.S. 2d 223, 225↩ (Nassau County Ct. 1963). Petitioners have failed to prove that these assets--rugs, appliances, hot water tanks--were not annexed to the buildings. 30. We lack any means to allocate depreciation deductions to petitioners for the periods in 1968 and 1969 in which they owned some of the developed property. ↩
31. Again, we note that respondent disallowed the claimed depreciation deductions only on grounds of ownership--we have considered no other reasons for disallowing the claimed deductions.↩