WILLIAM B. STRONG AND CONSTANCE L. STRONG, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2173-74—2175-74, 2206-74—2208-74.  ، Filed April 5, 1976.

[1] Cases of the following petitioners are consolidated herewith: Fred W. Pollman and Agnes K. Pollman, docket No. 2174-74; Paul W. Henninger and Mabel E. Henninger, docket No. 2175-74; Victor L. Alger and Coral E. Alger, docket No. 2206-74; Frederic B. Adler and Helen P. Adler, docket No. 2207-74; and Colburn A. Jones and Patricia L. Jones, docket No. 2208-74.

*Robert V. Hunter,* for the petitioners.
*Bernard R. Baker III,* for the respondent.

TANNENWALD, *Judge:* Respondent determined the following deficiencies in these consolidated cases:

| Docket No. | 1965 | 1966 | 1968 | 1969 |
|---|---|---|---|---|
| 2173-74 | 0 | 0 | $6,402.96 | $4,725.61 |
| 2174-74 | 0 | 0 | 1,946.00 | 520.00 |
| 2175-74 | 0 | 0 | 929.95 | 361.17 |
| 2206-74 | 0 | 0 | 491.57 | 178.33 |
| 2207-74 | 0 | 0 | 1,057.10 | 613.00 |
| 2208-74 | $1,333 | $573 | 2,691.00 | 9,534.49 |

At issue is whether net operating losses from the construction and operation of an apartment complex were those of a partnership or its controlled corporation.

### FINDINGS OF FACT

Some of the facts are stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference.

All of the petitioners are individuals who filed joint Federal income tax returns for the years 1968 and 1969 with the Internal Revenue Service Center at Andover, Mass. At the time the petitions were filed, Victor L. and Coral E. Alger, Frederic B. and Helen P. Adler, William B. and Constance L. Strong, and Colburn A. Jones resided in Delmar, N.Y.; Patricia L. Jones resided in Syracuse, N.Y.; Paul W. and Mabel E. Henninger resided in Castleton, N.Y.; and Fred W. and Agnes K. Pollman resided in Phoenix, Ariz. The parties have stipulated that any appeal in these cases "shall be taken in the United States Court of Appeals for the Second Circuit at New York, New York."

Prior to September 1967, Colburn A. Jones, William B. Strong, Victor L. Alger, Frederic B. Adler, Fred W. Pollman, and Paul W.

Henninger agreed to form Heritage Village Apartments Co., a partnership, for the purpose of developing an apartment complex to be known as the Heritage Village Apartments. The partners understood at that time that financing in the amount necessary to develop the apartments was not available to individuals because of the limitations on interest charges in the New York usury statute. They understood that corporations were not subject to these limitations, and that financing might be available to a corporate borrower. Accordingly, Heritage Village, Inc., a corporation owned by the partnership (hereinafter referred to as the corporation), was formed in September 1967 in anticipation of its use to obtain loan commitments. Jones was named as president and Robert V. Hunter as secretary of the corporation. The certificate of incorporation contained a broad and unqualified statement of purposes and authorized the issuance of 200 shares of capital stock without par value.

In October 1967, certificates of partnership were filed by the partners on behalf of Heritage Village Apartments Co. (hereinafter the partnership).

In August 1967, before either the partnership or the corporation was formed, a commitment for a permanent mortgage loan was obtained from the Bronx Savings Bank (hereinafter Bronx). This loan was to bear interest at 6¾ percent and was to be secured by an 18 (later 19) building apartment project. The commitment letter was addressed to "Heritage-State Farm Corp. c/o Mr. Colburn A. Jones."

The apartment project was to be constructed in three phases on separate parcels of land. By letter dated December 8, 1967, Chemical Bank New York Trust Co. (hereinafter Chembank) made a commitment to loan the corporation $2,100,000, bearing annual interest of 7 percent, for the purpose of constructing the first phase, known as "parcel 1." Among other things, the letter required that Jones and his wife personally guarantee the mortgage note. The partnership as "owner" had previously contracted with Heritage-State Farm Corp. (hereinafter the contractor) to construct the apartments on parcel 1.

On December 18, 1967, the partners entered into a formal partnership agreement. Among other things,[2] the agreement provided that Strong, Adler, Henninger, and Alger, as partners in Strong & Co., were to transfer certain real property designated "parcel 1" "to the partnership or its nominee." It also provided that:

It is agreed that title to the aforesaid Parcel may be held by a corporate nominee for the benefit of the partnership, it being the intention of the parties hereto that at all times the real and beneficial owner of the said Parcel shall be the partnership.
* * *

6. *Construction on Parcel 1*—The parties hereto agree that Jones shall have and is hereby granted the authority on behalf of the partnership (through a nominee corporation, if determined by Jones and Strong) to negotiate for and enter into a Construction Loan Agreement, first or subordinate mortgage financing and related instruments * * * to finance the construction of the apartment units and related improvements on Parcel No. 1.
* * *

Jones agrees to guarantee such construction loan in the event that the lending institution shall request.

Promptly upon execution of this Agreement the partnership shall enter into a Construction Agreement with Heritage-State Farm Corp., a New York corporation, the sole shareholder of which is Jones and/or his spouse. * * *

Such construction * * * shall be in accordance with plans and specifications which shall be prepared on behalf of the partnership * * *
* * *

9. *Authorized Signatures on Behalf of Partnership:* The joint signatures of Jones and Strong shall be required on all deeds by the partnership, on any Construction Loan Agreement and on any bond and mortgage executed by or on behalf of the partnership.

All documents hereinafter referred to as executed by the corporation were signed only by Jones, as president.

Also on December 18, 1967, the members of Strong & Co. entered into a separate agreement whereby Strong, Adler,

---

[2] The ownership interests provided for before and after the admission of a new partner, Robert Flannigan, on Aug. 21, 1969, were:

| Partner | Percentage of ownership | |
| --- | --- | --- |
| | Prior to 8/31/69 | After 8/21/69 |
| Jones | 65.00 | 62.00 |
| Strong | 16.43 | 20.37 |
| Adler | 3.57 | 4.43 |
| Henninger | 3.57 | 4.43 |
| Alger | 1.43 | 1.77 |
| Pollman | 10.00 | 4.00 |
| Flannigan | - - - | 3.00 |

Flannigan deducted no distributive share of partnership losses in 1969.

Henninger, and Alger would convey real property, known as parcels 2 and 3, to the partnership. That agreement stated that it was an amendment to the partnership agreement and contained language similar to the above-quoted portions of the partnership agreement in respect of the conveyance to the partnership or its nominee and the holding of title by a corporate nominee for the benefit of the partnership. It also provided for the reconveyance of parcels 2 and 3 to the aforementioned named individuals under certain circumstances. On August 21 and December 18, 1969, the partnership agreement was twice amended in respects not material herein. The August 21, 1969, agreement constituted a restatement thereof to admit Flannigan (see n. 2 *supra*) and incorporated the previously agreed-upon provisions relating to parcels 2 and 3; the corporation was not a party to this agreement.

A deed transferring parcel 1 from Strong, Adler, Henninger, and Alger to the corporation pursuant to the partnership agreement was executed on December 27, 1967, and recorded on January 8, 1968. Parcels 2 and 3 were deeded to the partnership and the deeds recorded in January 1968.

A building loan agreement and mortgage respecting parcel 1 between the corporation as mortgagor and Chembank as mortgagee was executed on December 29, 1967, and recorded on January 8, 1968. Paragraph 4(e) of the agreement provided:

4. *Representations and Warranties.* Borrower represents and warrants to Lender that:
* * *

(e) If Borrower purports to be a corporation, (i) it is a corporation duly organized, existing and in good standing under the laws of the state in which it is incorporated, * * * (iii) it has the corporate power, authority and legal right to carry on the business now being conducted by it and to engage in the transactions contemplated by this Agreement, the Note and the Mortgage, and (iv) the execution and delivery of and the carrying out of the transactions contemplated by this Agreement, the execution and delivery of the Note and the Mortgage, and the performance and observance of the provisions of all the foregoing, have been duly authorized by all necessary corporate and stockholder actions of Borrower and will not conflict with or result in a breach of the terms or provisions of any existing law or any existing rule, regulation or order of any court or governmental body or of the Certificate of Incorporation or the By-laws of Borrower.

The agreement also recited that the corporation was the owner of the mortgaged property, and provided that it could not be

assigned by the borrower without the consent of the lender and that any assignment in violation of this provision was an event of default. The agreement also included the following:

8. (c) Borrower shall furnish to Lender from time to time upon request (i) financial statements of Borrower, (ii) details relating in any manner to the financial condition of Borrower, and (iii) budgets and revisions of budgets of Borrower showing the estimated cost of construction of the Improvement and the amount of funds required at any given time to complete and pay for such construction.

The accompanying mortgage included an assignment of rents to Chembank and various covenants and warranties concerning the property. The loan was personally guaranteed by Jones.

During the year 1968, the first 18 apartment buildings on parcel 1 were completed. As buildings were completed, they were leased to tenants. Leases were executed in the name of the partnership as landlord. Upon completion of the buildings, Chembank assigned the mortgage indebtedness on parcel 1 to Bronx. An extension agreement between Bronx and the corporation was recorded on January 15, 1969. The extension agreement referred to a declaration of easement recorded simultaneously therewith by which the corporation as owner of parcel 1 and the partnership as owner of parcels 2 and 3 granted mutual easements. An amended declaration of easement was executed by the corporation, the partnership, Bronx, and Chembank on April 18, 1969.

In December 1968, the corporation obtained an insurance policy on the apartments naming itself as the insured. The policy covered completed portions of the project and was extended from time to time to include new buildings. In December 1969, the named insured was changed to read "Heritage Village Inc. and Heritage Village Apartments Company." The policy protected against destruction of the buildings and loss of rents.

By letter dated February 5, 1969, Chembank issued to the corporation a commitment to lend it $135,000 for the purpose of constructing an additional building on parcel 1. This loan was to bear interest at 8 percent. A loan agreement, mortgage, and note were executed by the corporation the following month. The loan agreement and mortgage contained substantially the same provisions regarding ownership of the property, existence and validity of the corporation, furnishing of financial statements, and assignment as were contained in the original building loan

agreement (see pp. 16-17 *supra*). Jones and his wife personally guaranteed both repayment of the loan and completion of the building.

The partnership decided to proceed with construction of additional apartments on parcel 2. In January 1969, the partnership and the contractor contracted for that construction. In March 1969, a commitment was obtained from Albany Savings Bank (hereinafter Albany) for a building loan of $2,150,000 bearing interest at 7¾ percent. The commitment letter was addressed to the partnership, but provided that the obligor and mortgagor would be "[a] corporation to be formed by you." In May 1969, a resolution on behalf of the corporation was executed authorizing the building loan and authorizing Jones and Hunter to execute necessary documents on behalf of the corporation. A mortgage and note, together with Jones' personal guarantee, were executed by the corporation shortly thereafter. The mortgage was recorded simultaneously with a deed transferring parcel 2 to the corporation.

In April 1969, the corporation gave a mortgage on parcel 3 to the Merchants National Bank & Trust Co. (hereinafter Merchants) to secure the amount of $75,000. Title insurance for this loan was obtained, with respect to which a form was issued listing "Title In: Heritage Village Apartments Company" and "Title To Be In: to be advised." In June 1969, a deed transferring parcel 3 from the partnership to the corporation was recorded.

In July 1969, the corporation and Bronx by agreement consolidated and extended to December 27, 1983, the two construction loans on parcel 1, both of which by that time had been assigned to Bronx. The consolidated loan bore interest at a rate of 6.81 percent. An affidavit sworn to by Jones and attached to the extension instrument recited that the corporation was the owner of the subject premises.

In December 1969 (the last year in issue), Jones wrote a memorandum to Aaron Kaiser [3] which read in part:

> Please prepare a deed for all the lands and parcels 1, 2, and 3 of Heritage Village. You are to convey title from Heritage Village, Inc. to Heritage Village Apartments Co. as soon as the January advance is received from the Albany Savings Bank. The reason for this transfer involves IRS considerations.

---

[3] The relationship of Kaiser to any person mentioned herein is not disclosed on the record.

It will be necessary in February to transfer the property back to Heritage Village, Inc. for the purpose of receiving the February advance. As soon as the advance is made, you are to again transfer the property back to Heritage Village Apartments Co.

In other words, as of approximately January 10, 1970, the only time the title will rest in the corporation will be at the moment an advance is made. We will, of course, reimburse you for any out-of-pocket legal expenses involved in the drawing of the documents. If you have any questions, kindly call me.

In January 1970 after receipt of the January advance from Albany, all three parcels were deeded back to the partnership by the corporation. The property was transferred to the corporation in February 1970 and then back to the partnership after receipt of the February advance. This procedure continued until May 1970, when a warranty deed with full covenants was recorded, transferring all parcels to the partnership.

The buildings on parcel 2 were completed late in 1969 and early in 1970. The swimming pool and recreation center, located on parcel 3, were completed in late 1969. As each apartment building was completed, leases were executed between the partnership and tenants. Promotional literature describing the partnership as owner of the projects was distributed to prospective tenants.

During 1968 and 1969, the corporation maintained checking accounts at Chembank and Merchants. Advances on construction loans were deposited to these accounts and transferred by check either to the partnership or, if time was a factor, directly to the contractor. Receipts for all advances were signed by Jones as president of the corporation. The corporation kept no books or records other than the records of these accounts. Except for the advances on the construction loans and the disbursements thereof as aforesaid, all receipts and disbursements, income and expenses, and assets and liabilities pertaining to the construction and operation of the apartments—including rentals and all real estate taxes and water charges—were at all times received or made by, and carried on the books and records of, the partnership.[4]

The corporation issued no capital stock. No corporate meetings were held nor minutes maintained.[5] It filed Federal income tax returns but reported no income, loss, assets, or liabilities,

---

[4] The commitment fee on the Albany loan was paid by the contractor, which was reimbursed by the partnership.

[5] The record does not indicate how the corporate resolution referred to on p. 18, *supra*, was adopted.

reporting its principal business activity as "Nominee Corp." It did not apply for a Federal employer identification number [6] and had no employees.

From 1968 to 1970, the partnership employed various persons. Initially, these employees were carried on the payroll of the contractor as a matter of convenience; the contractor periodically billed, and was reimbursed by, the partnership for such compensation. Beginning in 1970, the partnership operated its own payroll account. It applied for and received an employer identification number.

In October 1967, permission was applied for in the name of the partnership to connect into the water distribution system of the town of Guilderland to service the needs of the planned apartments.

In November 1967, a permit was issued to the partnership to install sewer pipe to serve the apartments.

Certain utility easements encumbering the real property were released by agreement between the partnership and the utilities in August 1968. The agreement recited that the partnership was the owner of the premises.

In October 1969, the New York Department of Transportation issued to the partnership a permit to perform certain road work at the site of the apartment buildings.

Effective in October 1969, a settlement of claim for penalty for violation of State conservation laws by alteration of creek banks and beds at the site was entered into on behalf of the partnership with the New York Conservation Department.

In September 1969, the partnership applied for a permit to install a culvert pipe to permit the flow of a creek under a road at the apartment site. The permit was granted in November 1969.

The partnership prepared financial statements beginning with the year 1968. No financial statement of the corporation was ever prepared.

No assets other than the real property of the partnership were ever formally transferred to the corporation. The corporation was dissolved in September 1973.

---

[6] A number was assigned by the Service Center with which the corporate income tax returns were filed.

Petitioners formed a partnership for the purpose of constructing and operating an apartment complex on real estate contributed by several partners. In order to obtain financing for the project, it was necessary to transfer the property to a corporation wholly owned by the partnership so that mortgage loans could be made at an interest rate in excess of the limit imposed by State usury laws on loans to individuals.[7] Construction and operation of the apartments generated net operating losses during the years in issue which were reported on the partnership's returns and as distributive shares on the individual returns of the petitioners. The respondent determined that the corporation, as owner of the property, was the proper party to report those losses. Petitioners allege that the corporation was a nominee whose ownership should be disregarded for tax purposes. The crux of petitioners' case is that the corporation was merely a sham or device used for the purpose of avoiding the New York usury statute, that it performed no acts other than those essential to that function, and that to treat it as the actual owner of the property would be to exalt form over substance.

The use of sham or dummy corporations to avoid application of the usury laws is a recognized practice in New York. *Hoffman v. Lee Nashem Motors, Inc.,* 20 N.Y. 2d 513, 231 N.E. 2d 765, 285 N.Y.S. 2d 68 (1967); *Leader v. Dinkler Management Corp.,* 20 N.Y. 2d 393, 230 N.E. 2d 120, 283 N.Y.S. 2d 281 (1967). There is no doubt that petitioners sought to do business in partnership form and that the corporation was, at least in their eyes, a mere tool or conduit. Their argument is not without some appeal, but we conclude that it should not be accepted.

The principal guidepost on the road to recognition of the corporate entity is *Moline Properties v. Commissioner,* 319 U.S. 436 (1943). In that case, a corporation was organized as part of a transaction which included the transfer of mortgaged property to it by the shareholder, the assumption by it of the outstanding mortgages, and the transfer of its stock to a voting trustee named by the mortgagee as security for additional advances. Later the indebtedness was repaid and the shareholder reacquired control

---

[7] The maximum rate allowed on loans to individuals was 6 percent prior to July 1, 1968, 7.25 percent thereafter until Feb. 16, 1969, and 7.50 percent for the balance of the period involved herein. N.Y. Gen. Oblig. Law sec. 5-501 (McKinney Supp. 1975) and notes thereto.

of the corporation. Thereafter it mortgaged and sold some of the property it held, and leased another portion. The Court held that the corporation was a separate entity from its inception, and stated its rule of decision as follows:

> The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, *so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation,* the corporation remains a separate taxable entity. * * * In *Burnet* v. *Commonwealth Improvement Co., 287* U.S. 415, this Court appraised the relation between a corporation and its sole stockholder and held taxable to the corporation a profit on a sale to its stockholder. This was because the taxpayer had adopted the corporate form for purposes of his own. The choice of the advantages of incorporation to do business, it was held, required the acceptance of the tax disadvantages. [319 U.S. at 438-439. Fn. refs. omitted; emphasis supplied.]

Cases following *Moline Properties* have generally held that the income from property must be taxed to the corporate owner, and will not be attributed to the shareholders, unless the corporation is a *purely passive dummy* or is used for a tax-avoidance purpose. *Harrison Property Management Co. v. United States,* 475 F.2d 623 (Ct. Cl. 1973); *Taylor v. Commissioner,* 445 F.2d 455 (1st Cir. 1971); *National Investors Corp. v. Hoey,* 144 F.2d 466 (2d Cir. 1944); *Collins v. United States,* 386 F. Supp. 17 (S.D. Ga. 1974), affd. per curiam 514 F.2d 1282 (5th Cir. 1975). This is particularly true where the demand that the corporate entity be ignored emanates from the shareholders of a closely held corporation. See *Harrison Property Management Co. v. United States, supra* at 626; *David F. Bolger,* 59 T.C. 760, 767 n.4 (1973).[8] It has been suggested that the prevailing approach misses the point by focusing (as do the parties herein) on the viability of the corporate entity rather than the situs of real beneficial or economic ownership. Kurtz & Kopp, "Taxability of Straw Corporations in Real Estate Transactions," 22 Tax Lawyer 647 (1969). However, the thrust of the case law, as we read it, is to leave the door open to the argument that a

---

[8] See also *Higgins v. Smith,* 308 U.S. 473 (1940). Cf. *Colin v. Altman,* 39 App. Div. 2d 200, 333 N.Y.S. 2d 432, 433-434 (1st Dept. 1972): "the corporate veil is never pierced for the benefit of the corporation or its stockholders. * * * [The sole stockholder] is not the corporation either in law or fact and, having elected to take the advantages [of incorporation], it is not inequitable to subject him to the disabilities consequent upon his election."

corporation played a purely nominal or "straw" role in a transaction, while closing it firmly against any contention that a corporation may be disregarded simply because it is the creature of its shareholders. See cases collected and analyzed in Kronovet, "Straw corporations: When will they be recognized; what can and should be done," 39 J. Tax. 54 (1973).

The Supreme Court has held that shareholder domination, even to the extent that a corporation could be said to lack beneficial ownership of its assests and income, is insufficient to permit taxpayers to ignore the corporation's existence. *National Carbide Corp. v. Commissioner*, 336 U.S. 422, 433-434 (1949); *Moline Properties v. Commissioner, supra*. The Court of Appeals for the Second Circuit, to which appeal will lie herein, has similarly refused to disregard the interposition of a corporate entity between shareholders and their property, except where the corporation has not purported to deal with the property in its own right. The focus is on business purpose or activity with respect to the particular property whose ownership is in question.

In *Paymer v. Commissioner*, 150 F.2d 334 (2d Cir. 1945), two brothers formed a pair of corporations (Raymep and Westrich) to which they transferred legal title to certain real estate. Their purpose was to deter execution against the property by their individual creditors. Neither corporation engaged in any business activity except that Raymep obtained a loan and as part security "assigned to the lender all the lessor's rights, profits and interest in two leases on the property and covenanted that they were in full force and effect and that it was the sole lessor." 150 F.2d at 336. Westrich was disregarded on the ground that it "was at all times but a passive dummy which did nothing but take and hold title to the real estate conveyed to it. It served no business purpose *in connection with the property.*" 150 F.2d at 337. (Emphasis added.) Raymep, however, was not disregarded, because it did perform a business function as the owner of the property.

In *Jackson v. Commissioner*, 233 F.2d 289 (2d Cir. 1956), affg. 24 T.C. 1 (1955), the Court of Appeals disregarded holding companies which lacked separate business purpose or activity, stating that the situation was encompassed within the foregoing language in its opinion in *Paymer* and further observing:

A natural person may be used to receive income which in fact is another's. So, too, a corporation, although for other purposes a jural entity distinct from its

> stockholders, may be used as a mere dummy to receive income which in fact is the income of the stockholders or of someone else; in such circumstances, the company will be disregarded. [233 F.2d at 290 n. 2.]

Finally, in *Commissioner v. State-Adams Corp.,* 283 F.2d 395 (2d Cir. 1960), revg. 32 T.C. 365 (1959) (which involved a different factual situation), the court characterized its holding in *Paymer* as "nothing more than a restatement of the fundamental rule that income from real estate held in the name of a nominee will be taxed to the beneficial owner, not to the nominee." 283 F.2d at 398 (fn. ref. omitted). The mere fact that some of the documents herein speak in terms of a corporate nominee is not sufficient to bring petitioners within the exception to the general rule. *Harrison Property Management Co. v. United States, supra; Collins v. United States, supra;* cf. *Tomlinson v. Miles,* 316 F.2d 710 (5th Cir. 1963).

In short, a corporate "straw" may be used to separate apparent from actual ownership of property, without incurring the tax consequences of an actual transfer; but to prevent evasion or abuse of the two-tiered tax structure, a taxpayer's claim that his controlled corporation should be disregarded will be closely scrutinized. If the corporation was intended to, or did in fact, act in its own name with respect to property, its ownership thereof will not be disregarded.

The degree of corporate purpose and activity requiring recognition of the corporation as a separate entity is extremely low. Thus, it has been stated that "a determination whether a corporation is to be considered as doing business is not necessarily dependent upon the quantum of business" and that the business activity may be "minimal." See *Britt v. United States,* 431 F.2d 227, 235, 237 (5th Cir. 1970).

In this case, the corporation's purpose and activities were sufficient to require recognition of its separate ownership of the property in question and, a fortiori, of its existence as a taxable entity. The purpose to avoid State usury laws is a "business purpose" within the meaning of *Moline Properties. Collins v. United States, supra; David F. Bolger, supra.*[9] The corporation had broad, unrestricted powers under its charter. Compare *Collins v. United States, supra.* Its activities were more extensive than those which required recognition of Raymep in *Paymer v.*

---

[9] See also *Daniel E. Rogers,* T.C. Memo. 1975-289.

*Commissioner, supra.* Like Raymep, it borrowed money on the security of rents; in addition, it mortgaged the property itself and it received and applied the loan proceeds. It engaged in the foregoing activities on more than one occasion and is more vulnerable than was the corporation in *Collins v. United States, supra,* which was also formed to avoid usury law restrictions and placed only a single mortgage. These activities, carried out in its own name, go beyond "transactions essential to the holding and transferring of title." See *Taylor v. Commissioner,* 445 F.2d at 457. The fact that the corporation in this case, unlike those in other cases, did not enter into any leases does not, in our opinion, constitute a sufficient basis for distinguishing their thrust.[10]

Furthermore, the corporation was otherwise treated by the partnership in a manner inconsistent with petitioners' contention that the two were the same entity. The partnership agreement required that deeds, loan agreements, and mortgages "executed by or on behalf of the partnership" be signed by both Jones and Strong; property standing in the corporate name was so dealt with on Jones' signature alone. Separation of title to the various parcels permitted the creation of mutual easements, an act which would have been prevented by the doctrine of merger had the properties been under common ownership.[11] See *Parsons v. Johnson,* 68 N.Y. 62 (1877); *Snyder v. County of Monroe,* 2 Misc. 2d 946, 153 N.Y.S. 2d 479, 486 (Monroe County Sup. Ct. 1956), affd. mem. 6 App. Div. 2d 854, 175 N.Y.S. 2d 1008 (4th Dept. 1958). The corporation applied for and received insurance on the property in its own name.

Finally, although not determinative, an element to be considered is the fact that the corporate vehicle in this case, whatever the parties' intentions, carried with it the usual baggage attending incorporation, including limitation of the shareholders' personal liability during construction. Jones alone was potentially responsible (as guarantor) for repayment of the construction loans.

---

[10] In *Raymep Realty Corp.,* 7 T.C.M. 262 (1948), relied upon by petitioners, we held the execution of a lease in the name of a corporate nominee titleholder did not require the corporation to be recognized as a taxable entity. We characterized that single act as "a purely nominal adjunct to the holding of title." Here, by contrast, the business activity was the raison d'etre of the corporation.

[11] It is unclear in any event what practical purpose was served by the declaration of easement, in view of the later return of all parcels to the partnership.

In the final analysis, the corporation herein fits the mold articulated in *Collins v. United States, supra:*

The fact remains, however, that the corporation did exist and did perform the function intended of it until the permanent loan was consummated. It was more than a business convenience, it was a business necessity to plaintiffs' enterprise. As such, it came into being. As such, it served the purpose of its creation. [386 F. Supp. at 21.]

The fact that the purpose and use of the corporation was limited in scope is beside the point. See *Sam Siegel,* 45 T.C. 566, 577 (1966).

The tide of judicial history is too strong to enable petitioners to prevail, albeit that the activities of the corporation were substantially less than those involved in most of the decided cases with the exception of *Collins v. United States, supra.*

Having set up a separate entity through which to conduct their affairs, petitioners must live with the tax consequences of that choice.[12] Indeed, the very exigency which led to the use of the corporation serves to emphasize its separate existence. See *Moline Properties v. Commissioner,* 319 U.S. at 440; *David F. Bolger,* 59 T.C. at 766. Our conclusion is not based upon any failure of the petitioners to turn square corners with respondent; they consistently made clear their intention to prevent separate taxation of the corporation if legally possible. They took most precautions consistent with business exigency to achieve that end. We simply hold that their goal was not attainable in this case.[13]

Reviewed by the Court.

*Decisions will be entered for the respondent.*

---

[12] We realize that, given the economic realities, petitioners had only a Hobson's choice—between using a corporation and forgoing the construction project for want of financing. "But this merely serves to emphasize [the corporation's] separate existence. * * * Business necessity, i.e., pressure from creditors, made [its] creation advantageous to [the shareholders]." *Moline Properties v. Commissioner,* 319 U.S. 436, 440 (1943).

[13] Whether there are limits, albeit narrow, within which taxpayers might successfully structure transactions of the type involved herein is a question we do not decide. See Kronovet, "Straw corporations: When will they be recognized; what can and should be done," 39 J. Tax. 54 (1973). Compare Rev. Rul. 76-26, 1976-4 I.R.B. 5; Rev. Rul. 75-31, 1975-1 C.B. 10.