ROBERT M. MODEER AND JANICE L. MODEER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Modeer v. Commissioner
Docket No. 12638-79.
United States Tax Court
T.C. Memo 1982-127; 1982 Tax Ct. Memo LEXIS 619; 43 T.C.M. (CCH) 782; T.C.M. (RIA) 82127; March 16, 1982. Robert M. Modeer, pro se. Dale P. Kensinger, for the respondent. GOFFE
MEMORANDUM OPINION GOFFE, Judge: The Commissioner determined the following deficiencies in the petitioners' Federal income tax: Taxable Year
Ended
Deficiency
12/31/74
$ 1,252.51
12/31/75
2,601.30
Due to concessions, the only issue is whether business interest *620 in the amount of $ 12,310 was deductible by petitioners or by a corporation. The resolution of this main issue turns upon the determination of three sub-issues: (1) whether or not the corporation is to be recognized as a separate taxable entity for purposes of the Federal income tax, (2) is so, whether the corporation was an "agent" of the petitioners in incurring the interest expense and related indebtedness, and (3) whether interest which is withheld from loan proceeds by the lender is "paid" by a cash basis taxpayer. The petitioners timely filed a joint Federal income tax return for their taxable year 1975. At the time they filed their petition herein, they resided in Kansas City, Missouri. Urban Land Projects, Inc. ("ULP, Inc." herein), was incorporated as a Missouri corporation on March 4, 1970. The certificate of incorporation granted ULP, Inc., all of the rights and privileges granted corporations organized under the General Business Corporation Law of Missouri and provided that its period of existence was to be perpetual. Since its incorporation, ULP, Inc., has continued to exist as a valid corporation under Missouri law except for a brief period in 1972. Because *621 ULP, Inc., failed to file an annual registration statement and antitrust affidavit for 1971, its charter was revoked as of January 1, 1972. Raymond A. Sisson, acting in his capacity as the last president of ULP, Inc., filed on or about January 26, 1972, with the secretary of state of Missouri an "Application for Rescinding Forfeitures" along with (1) the annual registration fee and antitrust affidavit the failure to file which resulted in the forfeiture of ULP, Inc.'s rights and privileges, (2) all fees, charges, and penalties resulting from such failure to file, (3) all franchise taxes owed by ULP, Inc., (4) a fee of $ 50 and (5) an affidavit in which Raymond A. Sisson stated that he was the last president of ULP, Inc., that ULP, Inc., had not attempted to evade (nor had evaded) the process of any Missouri court, or attempted to conceal from the general public the location of its principal place of business in Missouri nor the address of its president or secretary, thereby preventing ordinary process of law to be served upon it. The document was signed by Raymond A. Sisson as the "last President" of ULP, Inc. On March 31, 1972, the secretary of state issued to ULP, Inc., a "Certificate *622 of Rescission of Forfeiture" providing that the forfeiture of ULP, Inc.'s charter was rescinded as of that date and that the corporation was restored to good standing. The Articles of Incorporation of ULP, Inc., provided that the purposes and functions of the corporation were: to own, hold, build, construct and erect buildings and structures of all types, and to buy, sell, lease, own, manage, operate, maintain, repair, restore and rebuild the same; to buy or otherwise acquire, own, hold, lease, sell or otherwise dispose of, and mortgage or otherwise incumber, real property and personal property of all kinds, and to operate, manage and maintain the same; to borrow money and for such purpose to execute notes, bonds, debentures, or any form of indebtedness, and to secure the payment of the same by mortgage, deed of trust or other form of incumbrance, pledge or other forms of hypothecation; to execute deeds, mortgages, deeds of trust, contracts and other types of written instruments; to represent as agent, broker, and attorney-in-fact, insurance companies of all kinds; and to do all things incident to the conduct of a general insurance agency. The articles provided that the duration *623 of ULP, Inc., was to be perpetual. There was no language in the articles of incorporation specifically authorizing ULP, Inc., to act as an agent for any person other than an insurance company. Under its by-laws, ULP, Inc., had as its officers a president, vice president, secretary, treasurer and such assistant secretaries and assistant treasurers as the board of directors was to prescribe. The by-laws also provided for their election, term of office, duties, and compensation, and permitted the board of directors to require them to post bond in order to assure the faithful and honest performance of their duties. The by-laws established the corporation's principal office as St. Joseph, Missouri, provided and prescribed detailed rules for shareholders' meetings, established a board of directors and specified the number and term of the directors, procedures for their meetings, and compensation for their attendance there. The by-laws further created an executive committee of the board and authorized the board to appoint other committees. The form and mode of transfer of ULP, Inc.'s, stock certificates and procedures regarding the stock transfer books were detailed in the by-laws, *624 as was the form of the corporate seal. Article X, section 2, provided that no loans were to be contracted on behalf of ULP, Inc., and no evidences of indebtedness were to be issued in its name unless authorized by a resolution of the board. Except for 1971, ULP, Inc., has annually paid the corporation franchise tax and filed the related registration statement. The corporation also filed annually, except for the year 1971, the registration and fee required by Mo.Ann.Stat. sections 351.120 and 351.126 (Vernon 1966). ULP, Inc.'s corporate minute book contains minutes of annual meetings for the years 1973 to 1976, inclusive. During 1973, 1974, and 1975, Mr. Raymond A. Sisson was the president of ULP, Inc. Mr. Lawrence Douglas was its vice president and petitioner Robert Modeer (hereinafter sometimes referred to as "petitioner") was its assistant secretary. Petitioner was not a director of ULP, Inc. Its shareholders were Mr. Sisson and Mr. Douglas, each of whom owned 50 percent of the common stock. In 1972, Messrs. Sisson, Douglas, and Modeer (hereinafter sometimes referred to as "the investors") made an oral agreement to acquire a 104-acre tract of land in Platte County, *625 Missouri. They intended to develop it for residential housing by grading it, installing sewers and water lines, and subdividing the property into lots. They planned to then sell the lots to purchasers for the purpose of constructing residential houses thereon. Under this oral agreement the profits from the venture were to be divided equally among the investors. When Messrs. Sisson, Douglas, and Modeer investigated the possibility of financing the residential development in Platte County (hereinafter the "project"), they found that prospective lenders were unable to lend funds to individuals due to interest rate ceilings on individual loans imposed by Missouri usury laws. In order to meet the requirements of lenders, the three decided that title to the real property to be used in the project would be transferred to, and that the financing agreements and related evidences of indebtedness would be executed by, ULP, Inc. The maximum permissible rate of interest in Missouri on secured loans made to individuals prior to January 9, 1975, was 8 percent per annum. During 1972, ULP, Inc., acquired approximately 104 acres of land in Platte County for use in the project. In September *626 1972, a contract for the purchase of 80 acres of land in Platte County was entered into between certain individuals by the name of Anderson as "Sellers" and "Urban Land Projects, Inc., a Missouri corporation, or assigns" as "Buyer." ULP, Inc., is referred to as "Buyer" throughout the contract, which makes no mention of ULP, Inc., acting in the capacity of agent for another party. The contract was signed by Raymond A. Sisson as the president of ULP, Inc. The contract required a down payment of $ 5,000 which was made by Messrs. Sisson, Douglas, and Modeer, each contributing equal amounts. In October 1972, a contract for the purchase of 23.65 acres of land in Platte County was entered into between certain individuals by the name of Miller as "Sellers" and "Urban Land Projects, Inc., a Missouri corporation, or assigns" as "Buyers." ULP, Inc., is referred to as "Buyer" throughout the contract, which makes no mention of ULP, Inc., acting in the capacity of agent for another party. The contract was signed by Raymond A. Sisson as president of ULP, Inc. A down payment of $ 10,000 was required under the contract and was made by Messrs. Sisson, Douglas, and Modeer, each contributing equal *627 amounts. At a meeting of ULP, Inc.'s board of directors held October 17, 1972, the board resolved that the following corporate officers, to wit: Raymond A. Sisson, President Lawrence A. Douglas, Vice President Betty C. Jones, Secretary-Treasurer, as well as those holding such offices in the future, were authorized to effect loans from, and deliver promissory notes and hypothecate corporate property to, the Commerce Bank of St. Joseph, Missouri, on behalf of ULP, Inc. At a meeting of ULP, Inc.'s board of directors held on November 9, 1972, it was resolved that one of the following officers of ULP, Inc., to wit: Raymond A. Sisson, President Lawrence A. Douglas, Vice President Betty C. Jones, Secretary-Treasurer would be authorized to sign checks drawn on ULP, Inc.'s corporate account at the First National Bank of St. Joseph, Missouri, borrow money from an execute promissory notes to the bank on behalf of ULP, Inc., and pledge corporate property as security therefor. On May 23, 1973, the board of directors of ULP, Inc., resolved that the Commerce Bank of St. Joseph was designated as a depository of ULP, Inc., and that any funds standing to the credit of the corporation *628 with the bank could be withdrawn by a check signed by one of the following corporate officers, to wit: Raymond A. Sisson, President Lawrence A. Douglas, Vice President Betty C. Jones, Secretary-Treasurer Robert M. Modeer, Assistant Secretary. On March 1, 1973, ULP, Inc., executed a real estate note payable to IDS Mortgage Corporation (hereinafter referred to as "IDS"), and a deed of trust securing same. These documents were subscribed as follows: URBAN LAND PROJECTS, INC.
By: /s/ Raymond A. Sisson Raymond A. Sisson, President. IDS cancelled these instruments on March 13, 1973. On March 12, 1973, ULP, Inc., made, in its own name, an acquisition and development loan application with IDS, which IDS approved. On the same date, ULP, Inc., issued to IDS a real estate note in the amount of $ 1,250,000 and a deed of trust securing same. The deed of trust covered the real property which ULP, Inc., had acquired for use in the project, and was made between "Urban Land Projects, Inc., a Missouri corporation," as the grantor, Donald B. Steele, as the trustee, and IDS, as the beneficiary. Both the note and related deed of trust were subscribed as follows: URBAN LAND *629 PROJECTS, INC.
By: /s/ Raymond A. Sisson Raymond A. Sisson, President. In the March 12, 1973, deed of trust, ULP, Inc., covenanted that it had good title in fee simple to the hypothecated real estate free and clear of all liens and encumbrances except those created by the deed of trust. The corporation agreed to pay all taxes and assessments levied or assessed upon the property and to promptly deliver the official receipts therefor to IDS. ULP, Inc., further agreed to keep all buildings then or thereafter erected or placed upon the project real estate insured against loss by fire or other casualty to the extent required by IDS and to promptly pay the insurance premiums. The deed of trust also incorporated by reference an acquisition and development loan agreement between ULP, Inc., as borrower and IDS as lender. Under the latter agreement, ULP, Inc., agreed that, prior to any advance under the loan from IDS, it would furnish to IDS, Interalia, (a) a mortgagee's title insurance policy, (b) such evidence of the corporation's authority to enter into the loan agreement as IDS might require and approve, (c) surveys and plats of the premises with detailed drawings of *630 the land grading, building lot lines, roads, streets, and public utility and other easements located or to be located or constructed thereon, and (d) evidence satisfactory to IDS that the plat has been duly recorded, aproved and accepted by the supervising government authorities and by the FHA. ULP, Inc., agreed upon fulfillment of these requirements, and no later than 30 days from the date of the loan agreement, to commence and vigorously expedite the development of the project. The agreement further provided that ULP, Inc., would request monthly loan disbursements in order to pay for work on the development which had already been performed and that each request would be signed by a representative of ULP, Inc., and appropriately verified. Also on March 12, 1973, Messrs. Sisson, Douglas, and Modeer and their respective wives executed a document entitled "Guaranty," which provided as follows: WHEREAS, URBAN LAND PROJECTS, INC. hereinafter called Borrower, may from time to time become indebted to IDS MORTGAGE CORPORATION, * * * NOW THEREFORE, for a valuable consideration, receipt of which is hereby acknowledged the undersigned, hereinafter, whether one or more, called Guarantors, *631 jointly and severally, hereby guarantee to IDSMC the prompt payment at maturity of the Guaranteed Indebtedness, as that term is herein defined, * * * 1. "Guaranteed Indebtedness", as that term is used herein, means all indebtedness of every kind and character, whether now existing or hereafter arising, or Borrower to IDSMC, regardless of whether evidenced by notes, drafts, or otherwise, and without limit as to amount. Thus, these six individuals personally guaranteed the indebtedness of ULP, Inc., to IDS on the $ 1,250,000 project loan and related note. On March 31, 1973, ULP, Inc., by its president Raymond A. Sisson, executed the following document: DECLARATION OF TRUST
WHEREAS, on the 31st day of March, 1973, Robert M. Modeer, Raymond A. Sisson, and Lawrence L. Douglas, caused to be conveyed to the undersigned URBAN LAND PROJECTS, INC., a Missouri corporation, the real estate and property, situated in the County of Platte, State of Missouri, described in Exhibit "A" attached hereto; and WHEREAS, in the transaction in which the aforementioned conveyance was made, the undersigned was acting for and on behalf of Robert M. Modeer, Raymond A. Sisson, and Lawrence L. *632 Douglas, and the consideration for such conveyance was furnished, arranged and guaranteed by said aforementioned persons or parties. NOW THEREFORE KNOW ALL MEN BY THESE PRESENTS, that the actual and equitable ownership of said real estate property is in said Robert M. Modeer, Raymond A. Sisson, and Lawrence L. Douglas; that the undersigned, URBAN LAND PROJECTS, INC., does hereby declare that it stands seized of the title thereto and holds the same entirely in trust for the use of said aforementioned persons or parties; that it will upon demand of aforementioned persons or parties convey said real estate to such person or persons or corporations as said aforementioned persons or parties may direct, and will generally do and perform any and all acts and things in respect to the same as it may be directed to do and perform by said aforementioned persons or parties. IN WITNESS WHEREOF, the undersigned has executed this declaration of trust the 31st day of March, 1973. URBAN LAND PROJECTS, INC. By /s/ Raymond A. Sisson
The real estate mentioned in the foregoing document was the project real estate acquired by ULP, Inc. ULP, Inc., obtained a comprehensive general liability *633 insurance policy (No. CG18-33-13) covering the project premises from Aetna Insurance Company. The policy period was from March 7, 1973, to March 7, 1976. ULP, Inc., was also the named insured on three fire insurance policies collectively covering the same period. The property insured, however, was not the project real estate but was instead a roof frame building occupied by tenants located at 4700 N.W. 64th Street, Kansas City, Missouri. ULP, Inc., and IDS agreed that interest on the loan funds advanced under the note would be deducted from the undisbursed loan funds on the first business day of each month that the construction loan was outstanding. Pursuant to this agreement, IDS each month reduced the funds available under the loan by the amount of interest which accrued during the preceding months on funds which had been previously disbursed under the loan. IDS followed this procedure beginning with March 1973 and continuing through March 1975. A memorandum dated July 13, 1973, provides as follows: TO: IDS Mortgage Corporation
RE: Construction Loan Number * * *, Loan Amount: $ 1,250,000.00, Borrower: Urban Land Projects, Inc. * * * [T]he * * * undersigned authorizes *634 Lender to deduct accrued interest due pursuant to the terms of [the] note * * * out of the undisbursed loan funds on the first business day of each month that said loan is outstanding * * *. DATED July 13, 1973
/s/ Raymond A. Sisson Borrower /s/ Lawrence L. Douglas Neither ULP, Inc., nor any of Messrs. Sisson, Douglas, or Modeer at any time made any payments of interest to IDS on the note. After securing financing for the project, contracts were made to grade the land and install sewers. Mr. Douglas, who was in charge of the construction phase of the project, would certify to IDS the percentage of completion under each contract. IDS would then transmit to ULP, Inc., the amounts necessary to pay contractors. ULP, Inc., would deposit these funds in its bank accounts and pay the contractors with checks drawn thereon. Messrs. Sisson and Modeer were also active in the project. Mr. Sisson negotiated for the purchase of the property and planned to sell the residential lots when the development was completed. Mr. Modeer negotiated the financing arrangements for the property. A contract for the sale of a portion of the project real estate was made between "Urban *635 Land Projects, Inc., a Missouri Corporation, Sellers, and Bob McLaughlin Construction Company, * * * Buyer." There was no mention in the contract that ULP, Inc., was acting in an agency capacity for another person. The project was unsuccessful and was not completed because both the interest rates under the loan from IDS and actual construction costs were higher than anticipated. Since IDS reduced the funds available to ULP, Inc., by the amount of prior interest accrued, the amount available for actual construction was significantly less than expected. After the project failed and payments to IDS required under the loan agreement were not timely made, IDS, on March 10, 1975, through its corporate counsel in Kansas City, issued to ULP, Inc., a letter addressed as follows: URBAN LAND PROJECTS, INC., c/o RAYMOND A. SISSON COMPANY, 200 SOUTH 8TH STREET, ST. JOSEPH, MISSOURI 64501 Re: IDS Mortgage Corporation, Urban Land Projects, Inc., IDS Loan No. 010-305-0343 The letter notified ULP, Inc., that due to its failure to pay upon demand $ 99,842.67 interest due under the note for the months of July 1974 through February 1975, the note and related deed of trust were in default. *636 The letter further stated that IDS had discovered that state and county real property taxes on the project premises for 1974 were unpaid. The letter demanded that, prior to March 21, 1975, ULP, Inc., pay the past-due interest and furnish IDS copies of receipted tax bills showing that 1974 state and county taxes on the project property had been paid. Otherwise, IDS would declare the entire indebtedness under the note immediately due and payable and foreclose the loan pursuant to the deed of trust. Also on March 10, 1975, IDS issued through its counsel in Kansas City a letter to Messrs. Raymond A Sisson, Robert M. Modeer, Lawrence L. Douglas, and their respective wives. The letter recited that IDS was the holder of the Guaranty executed by the above parties whereby they guaranteed to IDS the repayment of the loan "by and between ULP, Inc., a Missouri Corporation, as borrower, and [IDS], as lender * * *." The letter demanded that they pay as guarantors the $ 99,842.67 past-due interest and deliver to IDS the receipted tax bills, described in the letter to ULP, Inc., on or before March 21, 1975, and notified them of the steps IDS planned to take if its demands were not met. *637 On March 24, 1975, IDS through its counsel issued a letter to ULP, Inc., addressed as was the March 10, 1975, letter. The letter notified the corporation that due to its failure to cure the deficiencies outlined in the prior letter, IDS had accelerated the maturity of the note and that the entire unpaid balance of principal, together with the interest accrued thereon, was due and payable. IDS threatened to foreclose the deed of trust and pursue other legal remedies unless all amounts due were paid in full before March 31, 1975. Also on March 24, 1975, IDS, through its counsel, issued to each of the guarantors of the note a letter advising them of the acceleration of the principal and interest due from ULP, Inc., and demanding that they perform their obligation of guaranteeing the payments to IDS under the note. Subsequent to the issuance of the foregoing letters, IDS filed a petition against each and every guarantor of the note in the Circuit Court of Clay County, Missouri. The petition described the making of the loan from IDS to ULP, Inc., and the issuance of the note and deed of trust. The petition then stated that the "defendants, on or about March 12, 1973, gave their *638 written, personal guarantees to IDS * * * that Urban Land Projects, Inc., would complete construction * * *, would pay all expenses incurred thereby, and would repay the loan in accordance with the terms of the Loan Agreement." The petition then mentioned the letters (above described) of March 10, 1975 (described supra), and represented that "Urban Land Projects, Inc., and the defendants, as guarantors, failed to pay IDS the * * * accrued interest due under the * * * note * * * or to furnish IDS with copies of receipted tax bills" for 1974 state and county taxes. The petition then noted IDS' acceleration of the entire balance owing and set forth IDS' foreclosure of the deed of trust. As of April 29, 1975, $ 1,165,783.51 was due under the note. On that date, IDS purchased the project real estate from the trustee under the deed of trust for $ 615,000, leaving a deficiency of $ 550,783.51 "due and owing IDS on behalf of Urban Land Projects, Inc.," which "has failed to * * * repay the construction loan in accordance with the terms of the loan document." The petition then represented that "[d]efendants, as guarantors, have refused and do refuse to tender to IDS the deficiency * *639 * * which Urban Land Projects, Inc. owes IDS * * * which these defendants have jointly and severally guaranteed to IDS" and prayed that judgment be entered against each and every defendant, jointly and severally, for the amount of the deficiency. ULP, Inc., intervened in this action and counterclaimed against IDS for breach of the acquisition and development loan agreement in that IDS did not mitigate damages as required by the agreement. The action and counterclaim were eventually dismissed without prejudice. Petitioners have not paid IDS any amount arising out of the guarantee of the note. No lots were sold in connection with the project and consequently the project generated no income. Messrs. Sisson, Douglas, and Modeer did not agree to pay and did not pay ULP, Inc., any amounts for holding title to the project real estate, executing the notes and deeds of trust, obtaining insurance, and maintaining bank accounts from which funds were disbursed to contractors. These three made no agreement interse respecting any accounting method to be used in connection with the project. ULP, Inc., did not maintain any formal set of books and records with respect to the *640 project. The checking accounts from which payments were made to the contractors are the only such records maintained. ULP, Inc., did not execute any notes, deeds of trust, or financing agreements during 1972 to 1975 other than those connected with the project. As of March 12, 1973, ULP, Inc., held no significant assets other than title to the project real property. Mr. Sisson did not claim on any of his individual income tax returns any interest deduction with respect to the project. Mr. Modeer did not take any such deductions on his original 1973 and 1974 income tax returns. They were first claimed in claims for refund filed April 19, 1976. He did deduct such interest in the amount of $ 12,310 on his 1975 return. The Commissioner disallowed the 1975 deduction with the following explanation: The deduction of $ 12,310.00 * * * as interest expense is not allowable because it has not been established that the interest accrued on an indebtedness of yours rather than * * * of Urban Land Projects, Inc. Furthermore, since the interest was not paid during the taxable year, no deduction is allowable to a cash basis taxpayer. Petitioners unfortunately have not submitted a brief *641 setting forth factual and legal arguments. Given the theories contained in the statutory notice and further explicated in respondent's brief, we surmise that petitioners would argue as follows: (1) ULP, Inc., is not a viable corporation and should not be recognized for tax purposes as a separate entity. Rather, the Court should "look through" this corporate shell and determine that its assets were actually owned, and its indebtedness was actually owed, by the investors and that, therefore, the interest expense on the note was actually incurred by them and not by ULP, Inc.; (2) in the event that we determine ULP, Inc., to be a viable corporate entity, it was in reality an "agent" of these individuals in purchasing the 104 acres, securing the financing from IDS, and in incurring the development and interest expenses. Issue 1. ULP, Inc., As a Separate Taxable Entity
ULP, Inc., was formed in 1970 and has existed as a valid corporation under Missouri law ever since, except for a brief period in 1972 when its charter was revoked for failure to file a registration statement and pay certain fees. The situation was quickly corrected, however, and ULP, Inc., was soon restored to good *642 standing. ULP, Inc., had articles of incorporation spelling out the corporate purposes and functions. By-laws established the corporate officers and principal office, provided for shareholder meetings (including detailed rules about such matters as voting proxies), established and set out rules regarding a board of directors, specified the form and manner of transfer of the corporation's stock certificates, and provided that no debt was to be created in ULP, Inc.'s name unless authorized by a resolution of the board. Annual shareholder meetings were held from 1973 to 1976, inclusive. The board of directors met and adopted resolutions authorizing ULP, Inc., to maintain corporate checking accounts and to take out loans from certain banks in St. Joseph, Missouri. ULP, Inc., transacted business in its own name. In the fall of 1972, it entered into contracts to purchase the 104 acres in Platte County (to be used in the project) from the Millers and Andersons. These were signed by Mr. Sisson as president of ULP, Inc. On March 12, 1973, ULP, Inc., entered into a financing arrangement evidenced by a note, a deed of trust, and an acquisition loan and development agreement. These *643 all refer to ULP, Inc., as the borrower and are all signed by Mr. Sisson as president. By executing these documents, ULP, Inc., undertook significant duties (outside of the obligation to repay funds advanced from IDS with interest) such as insuring the premises against fire and other hazards, paying all taxes, and expediting development. ULP, Inc., also covenanted that it had good, fee simple title to the project premises and would furnish to IDS upon request evidence of its authority to enter into the loan agreement. The loan agreement contemplated that ULP, Inc., would request, on the first working day of each month, sufficient funds from IDS to pay contractors for work performed to that date. The request was to be signed by a representative of ULP, Inc., and verified in such manner as IDS required. Messrs. Sisson, Douglas, and Modeer, together with their wives, executed a document entitled "Guaranty" in which they were referred to as "Guarantors." The document stated that ULP, Inc., "may from time to time become indebted to IDS * * *" and that the guarantors "guarantee[d] to IDS the prompt payment at maturity of any such indebtedness." The declaration of trust of March 31, 1973, referred *644 to ULP, Inc., as a separate entity, as did the memorandum of July 13, 1973, referring to ULP, Inc., as the "Borrower." ULP, Inc., entered into a contract with Bob McLaughlin Construction Company in its own name. After interest payments under the note became delinquent, IDS addressed separate letters on March 10, 1975, to ULP, Inc., and to the six individual guarantors. The first letter demanded that ULP, Inc., pay the past-due interest which it owed to IDS on the note. The second letter advised the guarantors of their duties and obligations under the guaranty and demanded that they pay the past-due interest to IDS as guarantors. On March 24, 1975, IDS issued two more letters, addressed as above. The one issued to ULP, Inc., advised it that IDS had accelerated the note's maturity and that the entire unpaid balance of principal, plus accrued interest, was then due from ULP, Inc., on the note. The second letter advised the six guarantors of the acceleration and demanded that they perform their obligation under the guaranty and pay to IDS the full amount which ULP, Inc., owed. IDS subsequently foreclosed the deed of trust, sold the project real estate and applied the proceeds *645 against the amounts due from ULP, Inc., on the note. IDS sued the six guarantors for the deficiency. The petition was based upon their liabilities as guarantors of ULP, Inc.'s debt to IDS. ULP, Inc., intervened and counterclaimed against IDS. The project property and the indebtedness to IDS were acquired and incurred by ULP, Inc., rather than by the six individual guarantors, in order to circumvent Missouri usury law. The foregoing facts make clear that ULP, Inc., cannot be disregarded as a mere shell having no separate entity status. It was treated and respected by all parties concerned as an independent corporate entity. Corporate formalities were observed. Detailed articles of incorporation and by-laws were drawn up for it; there were annual shareholder meetings for at least 1973 through 1976. Except for 1971, ULP, Inc., filed its annual statement and paid its annual fee and thus continued as a viable Missouri corporation. For a brief period in 1972 its charter was forfeited but especial pains were quickly taken to rectify the situation. The board of directors met and authorized the opening of checking and loan accounts with St. Joseph banks. In connection with the *646 project, the Andersons, Millers, and IDS dealt with ULP, Inc., as a separate corporate entity. It is true that Messrs. Sisson, Douglas, and Modeer guaranteed the note; yet, this was wholly consistent with ULP, Inc.'s separate status as the primary obligor. ULP, Inc., as an entity, intervened in a suit to which the investors were already party. ULP, Inc., also conducted substantial business activity as a corporation. It acquired the 104 acres of land used in the project, entered into the financing arrangement with IDS, and disbursed funds to contractors from its corporate accounts. Messrs. Sisson, Douglas, and Modeer availed of ULP, Inc., to avoid the restrictions of Missouri usury law. A corporate entity will be recognized for tax purposes if it was organized for valid business purposes, has a special function from its inception, and carries on unambiguous business activities subsequent to its formation. Moline Properties v. Commissioner,319 U.S. 436, 440 (1943). Avoidance of state usury laws is a valid business purpose. Strong v. Commissioner,66 T.C. 12 (1976), *647 affd. without opinion 553 F.2d 94 (2d Cir. 1977). Under this test, it is clear that during the years in issue ULP, Inc., was a separate taxable entity and not a mere "sham" or "shell." A taxpayer will normally be held, for tax purposes, to the form in which he has voluntarily chosen to conduct his business. Issue 2. Corporate Agency
It is likely that petitioners' main argument would be that ULP, Inc., while to be recognized as a separate taxable entity, was in reality an "agent" of Messrs. Sisson, Douglas, and Modeer in acquiring the property, securing the financing, and incurring interest expense. Petitioners would no doubt point to the declaration of trust, executed by ULP, Inc., on March 31, 1973, as creating such an agency relationship. In the recent case of Roccaforts v. Commissioner,77 T.C. 263 (1981), we recognized that under certain circumstances a true corporate agency could exist, and set forth the analysis to be applied in resolving this issue. We adopted the criteria specified by the Supreme Court in National Carbide Corp. v. Commissioner,336 U.S. 422, 436 (1949), and we are thus compelled to so analyze this *648 case. As a preliminary matter, however, we would like to comment upon the effect of the corporation's declaration of trust. The existence of an agency agreement [1] might tend to indicate that a substantive agency relationship was actually created, but it is certainly not dispositive of the issue. Jones v. Commissioner,640 F.2d 745, 753 (5th Cir. 1981), cert. denied     U.S.     (Nov. 2, 1981), affg. a Memorandum Opinion of this Court; Roccaforte v. Commissioner,supra at 283, 285. Nor is the fact that equitable title may be in the alleged principal. Jones,supra at 753. We also note that petitioners have the burden of proving that a true corporate agency exists. Welch v. Helvering,290 U.S. 111 (1933). *649 We turn now to the analysis mandated by Roccaforte,supra. The first factor is whether the corporation operated in the name and for the account of the principal. The record clearly shows that this was not the case. In none of the documents discussed above was ULP, Inc., ever referred to as any sort of agent for any other person. Petitioner has not shown that those who dealt with ULP, Inc., were aware that it was acting for Messrs. Sisson, Douglas, and Modeer. Interestingly, the articles of incorporation specifically authorized ULP, Inc., to represent insurance companies, yet did not provide for it to act as agent for other persons. Petitioners have not shown that it was disclosed clearly to relevant third parties that the corporation operated for the account of the investors or for that of an undisclosed principal. The second element is whether the principals are bound by the alleged corporate agents' actions. We conclude that petitioners have failed to prove this element.First, as stated above, there is no evidence that third parties dealing with ULP, Inc., were aware that it was acting as agent for Sisson, Douglas, and Modeer. In fact, ULP, Inc., was treated as *650 the primary obligor on the note by IDS. The individual investors guaranteed the note, of course, but in a true agency relationship their liability would not have been secondary, as guarantors, but primary, as principals bound by the act of the agent. In other words, this mere guarantee of the debt was not sufficient in itself to apprise IDS (or others) of an agency relationship. Further, it is not at all clear that the declaration of trust of March 31, 1973, binds any of the investors to anything. ULP, Inc., merely declared that it was holding the property in trust for the investors. There is no indication that the investors intended or agreed to be bound by the corporation's acts and/or representations; in fact, they did not even sign the document. It would be quite difficult for a third party to use the declaration without other evidence to prove that they were liable as principals for the acts and obligations of the corporation. Compare our facts with those in Roccaforte,supra, where the agency relationship was common knowledge among relevant third parties and the principals executed an agency agreement in which they committed themselves to indemnify the *651 corporate agent for its acts and debts and agreed that they, and not the corporation, should be liable for the mortgage which the corporation had entered into. The third and fourth factors are not relevant here because no income was generated. The fifth factor is whether the corporate agent's relationship was dependent upon the fact that it was owned and controlled by the investors. The inquiry is whether the corporation would have entered into the agency relationship absent such ownership and control, i.e., whether the agreement was arm's length. In our case, Messrs. Sisson and Douglas owned 100 percent of ULP, Inc.'s stock. The investors did not agree to pay and did not pay ULP, Inc., any compensation for performing its alleged agency services. There is no evidence that ULP, Inc., would ever have received any such compensation. No profit-oriented economic entity would, at arm's length, enter into such an arrangement. We thus conclude that petitioners have failed to show that ULP, Inc.'s, relationship with the investors was independent of their control of its stock. The final factor is whether the corporation's activities were consistent with the normal duties of an *652 agent. In our discussion of this factor in Roccaforte,supra, we observed that the taxpayers therein had "put forth sufficient evidence to convince us that the acts of the corporation were consistent with the claims of agency. They were careful to endow the corporation with specific indicia of an agency relationship." As examples, we pointed to the facts that the investors represented to creditors that they, and not the corporation, were the true obligors on the note, and that the corporation held only mere legal title to the property. In Jones,supra at 754, the court stated: Taxpayers have introduced no evidence in this regard. In particular, taxpayers have introduced no evidence to prove that corporate general partners commonly take title to real estate without disclosure of any fiduciary capacity. We are mindful of the fact that the National Carbide test contains, as one of its factors, an inquiry into whether the agency was disclosed. There is no indication in this record that it is more common common for a corporate general partner to act in an undisclosed capacity than for an agent to do so. * * * [640 F.2d at 754; footnote *653 omitted.] In the instant case, there is no evidence that ULP, Inc., ever disclosed its agency capacity to any third parties. Although it executed the March 31, 1973, declaration of trust, there is likewise no evidence that this trust relationship was disclosed. Indeed, in the March 12, 1973, deed of trust, ULP, Inc., covenanted that it had good, fee simple title to the project property. There was also no evidence that a corporate agent would omit to disclose its capacity.On balance, we conclude that petitioners have not shown that ULP, Inc., functioned in a manner consistent with the normal duties of an agent. It is our view that, on the basis of the foregoing analysis, ULP, Inc., was not a true agent of the investors. Hence, all interest deductions are properly attributable to it as a separate entity, and not to the investors. Issue 3. Interest "Paid"
Having found that ULP, Inc., was a taxable entity separate and apart from the individual investors, and was not an agent of same in incurring the indebtedness to IDS and related interest expense, it, of course, follows that any such expense, if deductible by any taxpayer, is deductible only by ULP, Inc. Assuming *654 arguendo, however, that ULP, Inc., was an agent of the investors, they would nevertheless not be entitled to an interest deduction for the simple reason that they never "paid" any interest. A cash basis taxpayer who satisfies an interest obligation merely by incurring a new obligation does not "pay" the interest within the meaning of section 163(a).Similarly, where a taxpayer on the cash basis who is indebted on a note for past-due interest borrows from his creditor an amount in excess of the past-due interest on a second note, and the creditor advances to the taxpayer the principal amount of the second note less the past-due interest, no cash payment is made warranting a deduction. Cleaver v. Commissioner,6 T.C. 452, 454 (1946), affd. 158 F.2d 342 (7th Cir. 1946), cert. denied 330 U.S. 849 (1947); Franklin v. Commissioner,77 T.C. 173, 183 (1981). The facts of the instant case fall squarely within the letter situation. IDS merely withheld past-due interest upon earlier advances of development funds from later ones, *655 thus reducing the amount of funds advanced. Under this method, no interest was ever "paid"; the unpaid balance of principal and interest merely continued to accumulate, and was the subject of IDS' subsequent collection efforts. Thus, under no theory may petitioner deduct any part of the interest accured on the note during 1975. To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. It is not clear, however, that the declaration even qualifies as an "agency agreement." It was not so denominated, and it was not signed by any of the investors. Compare this document with the agency agreement in Roccaforte v. Commissioner,77 T.C. 263 (1981), which clearly purported on its face to create an agency relationship and was signed by the investors as principals. The declaration is thus even less probative of an agency relationship than would be a Roccaforte↩-type agreement.