J. A. HIPP, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Hipp v. Commissioner
Docket Nos. 3883-79, 3884-79, 14083-79.
United States Tax Court
T.C. Memo 1983-746; 1983 Tax Ct. Memo LEXIS 44; 47 T.C.M. (CCH) 623; T.C.M. (RIA) 83746; December 14, 1983. Charles B. Mott, Jr., for the petitioner in docket Nos. 3883-79 and 14083-79. Paul W. Hoover, Jr. and O. H. Storey, III, for the petitioners in docket No. 3884-79. Paula M. Jung and Richard D. Ames, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in Petitioners' Federal income and gift tax for the taxable years as follows: Docket
Taxable
Petitioners
Nos.
Tax
Year
Amounts
J. A. Hipp
3883-79
Income
1974
$136,968.60
Juel C. and
3884-79
Income
1974
174,799.67
Audra M. Hipp
J. A. Hipp
14083-79
Gift
1975
76,733.94
*48 After concessions by the parties, the issues for decision are: (1) whether Hipp Real Estate, Inc., is the owner of various tracts of real property for Federal income tax purposes; (2) the date and nature of real property distributions by Hipp Real Estate, Inc., to petitioners; (3) the fair market value of the various parcels of real property at the time of distribution; and (4) the fair market value of various parcels of real property when they were subsequently given by a distributee as gifts. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and supplemental stipulations of facts and accompanying exhibits are so found and incorporated herein by reference. Petitioner J. A. Hipp was single throughout 1974 and filed an individual Federal income tax return for his 1974 taxable year. Petitioners Juel C. and Audra M. Hipp were married at all times during 1974 and filed a joint Federal income tax return for the 1974 taxable year. [2] Petitioner J. A. Hipp filed a Federal gift tax return for the quarter ending in December, 1975. All of these tax returns were filed with the Internal Revenue Service in Austin, Texas. All of the petitioners were *49 legal residents of Arkansas when they filed their petitions. In 1946, petitioner J. A. Hipp and two of his sons, Wesley and petitioner Juel C. Hipp, formed a partnership, Hipp Lumber Company, which was based in Prim, Arkansas. This partnership initially began a saw mill operation in which timber was cut into rough boards for resale to lumber finishing concerns. Soon thereafter, these three individuals began purchasing various parcels of timberland in Cleburne, Izard, Stone, and Independence counties of northern Arkansas for investment and for growing and harvesting timber. Almost all of the parcels were purchased from the State of Arkansas which had acquired the property in tax forfeiture proceedings. Some of these lands were purchased in the name of Hipp Lumber Company and the remaining parcels were purchased in the names of one of the individual partners. *50 Although title to tracts in this latter category was in one of the individual partner's names, the partners considered themselves as having equal undivided ownership interests in such lands. To the extent possible, Hipp Lumber Company utilized the available timber on its property for its saw mill operations. By 1968, the partnership owned approximately 12,000 acres of land. The tracts of real property comprising this accumulation of acreage varied in size, terrain, availability of access, and type and extent of growth thereon. The individual parcels ranged in size from one to 320 acres, with the vast majority of tracts at least 40 acres in size. Some of these individual tracts of real property were continguous. The terrain of this real property also varied from relatively flat pasture lands to extremely rough and steep mountain sides, cliffs and bluffs. Much of the lands consisted of moderately or extremely steep mountain sides. The availability of access to such real property was generally poor. Although a few tracts actually fronted improved roads, much of the property was not readily accessible or was accessible only over lands owned by other individuals. Some of the *51 property was not accessible by land vehicles. A site index refers to the number of feet a tree will grow in 50 years. It will vary due to soil quality, terrain, and other factors. As the site index of a particular tract increases, so does its growing capacity. These lands generally has a low site index. Softwoods consisting of pine and cedar and various hardwoods including oak, gum, hickory, and walnut generally covered the acreage. Some of the timber stands were currently capable of producing saw timber while much of the growth constituted pulp timber or scrub. While such lands were owned by Hipp family members, no additional work was undertaken to improve the existing timber stands pursuant to scientific forest management programs. Despite this, however, land prices in this general area began to increase rapidly during the mid-1970s. In 1968, petitioner J. A. Hipp recommended to his partners that their business activities be conducted in corporate form. The rationale for incorporation included limited liability, continuity of life to assist management and to facilitate the transfer of ownership. The partners agreed to incorporate and to expand their business activities *52 to include the sale of finished lumber and hardware materials. Wesley Hipp and petitioners J. A. and Juel Hipp subsequently formed three Arkansas corporations in which they were equal shareholders. They transferred existing lumber in the saw mills to Hipp Lumber Manufacturing Corporation. Some hardware, lumber, building and bookkeeping materials were transferred to Hipp Lumber and Hardware, Inc. Finally, these individuals formed Hipp Real Estate, Inc., and contributed approximately 12,000 acres of land to it pursuant to a nontaxable section 351 [3] exchange in which each person received 23,000 shares of its common stock. Hipp Real Estate, Inc., generally complied with all corporate formalities. The owners filed Articles of Incorporation with Arkansas' Department of State, adopted bylaws, elected shareholders as officers and directors, and maintained various corporate records including minutes of its infrequent board of director meetings. The Articles of Incorporation of Hipp Real Estate, Inc., provide for extremely broad corporate purposes which also *53 specifically include the sale of lumber and wood products and the purchase, holding, management, improvement, and sale of real property. Wesley Hipp prepared Federal corporate income tax returns for taxable years 1968 through 1974, inclusive, which reflected the following timber sales and information: Cost of
Year
Date Filed
Gross Sales
Goods Sold
1968
1/23/69
$1,502.88
$1,502.88
1969
1/20/70
3,738.91
3,738.91
1970
2/15/71
1,690.33
3,116.13
1971
1/24/72
2,225.05
2,225.05
1972
1/19/73
0
0
1973
1/31/74
0
0
1974
1/31/75
0
[4] 23,723.61
In 1969 and 1970, Hipp Real Estate, Inc., purchased 360 and 80 additional acres of land, respectively. By this time, the Hipp family enterprises had harvested most of the commercially operable stands of timber on their properties although harvesting could resume in approximately 10 years due to additional growth of previously uncut trees. In 1972, Hipp Real Estate, Inc., instituted *54 suit against a pipeline company, an engineering concern, and a construction firm for damages to land and timber resulting from the rupture of an anhydrous ammonia fertilizer pipeline which crossed its property. Throughout its existence, Hipp Real Estate, Inc., maintained and regularly used a checking account. It also kept detailed inventories of its real property holdings for each calendar year. Further, the corporation incurred and carried on its books as accounts payable, financial obligations to Hipp Lumber and Hardware, Inc., Hipp Lumber Manufacturing Corporation and its shareholders. Although the record is incomplete, the average total outstanding indebtedness of Hipp Real Estate, Inc., exceeded $8,000 from 1968 through 1973. The proceeds of these loans were utilized by the corporation to pay real property taxes, corporate franchise taxes, operating expenses, and to acquire additional real property. For all of the relevant taxable years, Hipp Real Estate, Inc., had no current or accumulated earnings and profits.
In October, 1973, petitioner J. A. Hipp decided to sell his interests in the three corporations to his sons, Wesley Hipp and petitioner Juel C. Hipp. On October 18, 1973, petitioner *55 J. A. Hipp sold his interests in such corporations for a total of $250,000, $183,733 of which constituted a promissory note. In determining the total purchase price, the parties agreed that the real property was worth an average of approximately $45 per acre. Sometime in December, 1973, petitioner J. A. Hipp became dissatisfied with the sale of his stock in Hipp Real Estate, Inc., which owned the approximately 12,000 acres of land the three individuals had acquired while operating as a partnership. On December 27, 1973, petitioner J. A. Hipp traded the $183,733 promissory note, upon which no payments had been made, to Hipp Real Estate, Inc., in exchange for 23,000 shares of common stock. On January 18, 1974, a special meeting of the officers, directors, and shareholders of Hipp Real Estate, Inc., was held. They unanimously agreed to permit petitioners J. A. Hipp and Juel Hipp to exchange their one-third interests in the corporation for one-third of the corporation's real property. The shareholders utilized a lottery process to divide the corporation's real property into three groups of approximate equal value. Upon conclusion of this lottery process and petitioners' tendering *56 of their stock certificates, appropriate deeds were prepared conveying 4,198.42 and 4,102.43 acres of land to petitioners Juel Hipp and J. A. Hipp, respectively. The lands received by both petitioners were generally comparable. With the exception of one instrument, all of the documentation concerning this transaction, including the stock certificates, the stock ledger, deeds, corporate resolutions, resignations, and minutes, bore dates or acknowledgments of January 18, 1974. The lone exception is petitioner J. A. Hipp's stock certificate which indicates a January 23, 1974, transaction. Further, where appropriate, these documents also bore the date January 18, 1974, as subscribed to by an attending notary public. Subsequent to this transaction, Wesley Hipp became the sole stockholder of Hipp Real Estate, Inc., which, through the date of trial, continued to own over 4,000 acres of real property. On November 17, 1975, petitioner J. A. Hipp made the following gifts to his children of the real property previously distributed to him: Donee
Gift
William L. and Vaneta M. Allen
1168.9 acres
as tenants-by-the-entirety
Paskle Dean Davis
1214.2 acres
Glynn A. Hipp
1200 acres
*57 On their individual Federal income tax returns for the 1974 taxable years, petitioners J. A. Hipp and Juel C. Hipp did not report the transaction involving the distribution of real property from Hipp Real Estate, Inc. Petitioners J. A. Hipp and Juel Hipp have not filed any elections pursuant to section 333. Hipp Real Estate, Inc., did not file any corporate liquidation information returns. Petitioner J. A. Hipp, on his Federal gift tax return for the quarter ending in December, 1975, utilizing a $35 per acre value, declared the respective values of the gifts as follows: Donee
Gift
Value
William L. and Vaneta M. Allen
1168.9 acres
$40,911.50
Paskle Dean Davis
1214.2 acres
42,497.00
Glynn A. Hipp
1200 acres
42,000.00
The Commissioner determined that petitioner J. A. Hipp received a taxable distribution from Hipp Real Estate, Inc., in 1974 which resulted in capital gains in the amount of $529,335.20. The Commissioner also determined that petitioner Juel C. Hipp received a taxable distribution from Hipp Real Estate, Inc., in 1974 which resulted in capital gains in the amount of $534,455.20. The Commissioner determined that the value of the gifts given *58 by petitioner J. A. Hipp to his children had a collective value of $447,875 and made no individual valuations of each gift. ULTIMATE FINDING OF FACT Petitioners' stock in Hipp Real Estate, Inc., was redeemed by the corporation on January 18, 1974. The real property distributed to petitioners in exchange for their stock had an average fair market value of $65 per acre on said date. The real property given by petitioner J. A. Hipp to his children on November 17, 1975, had an average fair market value of $70 per acre. OPINION Issue 1. Owner of Real Property for Federal Tax Purposes
The first issue for decision concerns who was the owner of the approximately 12,000 acres of real property for Federal tax purposes. Petitioners contend that Hipp Real Estate, Inc., should be disregarded for Federal tax purposes and that its stockholders in their individual capacity were really the true owners of the property; hence, no tax consequences should attach to the distribution of the real property to petitioners. In support thereof, petitioners argue that: (1) Hipp Real Estate, Inc., did not engage in any meaningful business activity; (2) they did not consider it the true owner *59 of the property; (3) they did not intend for it to be the true owner of the property; and (4) they did not adhere to the strict formalities of the corporation as a separate legal entity. Respondent contends that Hipp Real Estate, Inc., must be regarded as a separate legal entity which owned the real property for Federal tax purposes since it was formed for bona fide business purposes and engaged in business activities. Given the parties' characterization of this issue as whether Hipp Real Estate, Inc., should be disregarded for Federal income tax purposes, we need not consider as controlling those cases dealing solely with whether a corporation should be deemed an agent. See Roccaforte v. Commissioner,77 T.C. 263, 278-279 (1981), revd. on another issue 708 F.2d 986 (5th Cir. 1983). [5]
A leading *60 case on the recognition of a corporate entity as a separate taxable entity is Moline Properties, Inc. v. Commissioner,319 U.S. 436, 438-9 (1943), wherein the Supreme Court summarized the primary considerations: The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. * * * In Burnet v. Commonwealth Improvement Co.,287 U.S. 415, this Court appraised the relation between a corporation and its sole stockholder and held taxable to the corporation a profit on a sale to its stockholder. This was because the taxpayer had adopted the corporate form for purposes of his own. The choice of the advantages of incorporation to do business, it was held, required the acceptance *61 of the tax disadvantages. [Fn. refs. omitted.] Therefore, Moline established a two-prong test with the first part pertaining to whether incorporation served a business purpose and the remaining aspect concerning the entity's business activities. Collins v. United States,386 F. Supp. 17, 19 (S.D. Ga. 1974), affd. 514 F.2d 1282 (5th Cir. 1975). The business purpose and business activity tests are alternative requirements. Tomlinson v. Miles,316 F.2d 710, 714 (5th Cir. 1963), cert. denied 375 U.S. 828 (1963). In the immediate case, petitioners' rationale for incorporating their economic activities satisfies the business purpose standard enunciated in Moline.Incorporation provided a more convenient form of managing the family enterprises. They also were able to isolate any potential liabilities to the specific branch of their varied operations. Finally, incorporation served their personal convenience in assuring them continuity of life and management should one of them die. Harrison Property Management Co., Inc. v. United States,475 F.2d 623, 626 (Ct. Cl. 1973), cert. denied 414 U.S. 1130 (1974). *62 With respect to the alternate prong of Moline's corporate recognition criteria, i.e., the business activity test, we have held in Strong v. Commissioner,66 T.C. 12, 24 (1976), affd. without opinion, 553 F.2d 94 (2d Cir. 1977), that: The degree of corporate purpose and activity requiring recognition of the corporation as a separate entity is extremely low. Thus, it has been stated that "a determination whether a corporation is to be considered as doing business is not necessarily dependent upon the quantum of business" and that the business activity may be "minimal." See Britt v. United States,431 F.2d 227, 235, 237 (5th Cir. 1970).
Applying this standard to the immediate fact pattern, Hipp Real Estate, Inc.'s business activities warrant its recognition as a separate taxable entity. This is amply evidenced by the cumulative effect of the following: it was formally incorporated, stock was issued, by-laws adopted, directors elected, minutes of meetings were maintained, corporate records were kept, and corporate income tax returns were *63 filed, Sebago Lumber Co. v. Commissioner,26 T.C. 1070 (1956); it incurred substantial financial obligations, Paymer v. Commissioner,150 F.2d 334 (2d Cir. 1945), affg. in part and revg. in part a Memorandum Opinion of this Court; it maintained a checking account and actually engaged in the active harvesting of timber for sale on its properties for four years as evidenced by its tax returns for taxable years 1968 through 1971, inclusive, Taylor v. Commissioner,445 F.2d 455 (1st Cir. 1971), affg. a Memorandum Opinion of this Court; and, finally, it acted in its own name when it instituted and prosecuted litigation with respect to its real property, Strong v. Commissioner,supra. Such activities easily transgress the threshhold of "transactions essential to the holding and transferring of title." Taylor v. Commissioner,supra at 457. Petitioners' self-serving allegations that they did not intend nor consider Hipp Real Estate, Inc., to be the owner of the real property for Federal tax purposes are not controlling. Moline Properties, Inc. v. Commissioner,supra. Further, *64 the corporation's cessation of active harvesting of timber on its properties in the 1970s was due to the general lack of operable timber stands. Petitioners expected to be able to resume harvesting in about 10 years. Finally, that this family corporation may have been managed by its shareholders informally in their individual capacity is of no consequence. National Carbide Corp. v. Commissioner,336 U.S. 422, 433 (1949). Based upon the preceding discussions, Hipp Real Estate, Inc., has satisfied both alternative tests pertaining to its recognition as a separate taxable entity; hence, it must be deemed the owner of the real property for Federal income tax purposes concerning the distribution transactions. Moline Properties, Inc. v. Commissioner,supra.
Issue 2. Date and Nature of Real Property Distributions
The parties' next dispute pertains to the date and nature of the real property distributions to petitioners. Petitioners contend that: (1) in late December, 1973, the stockholders of Hipp Real Estate, Inc., unanimously agreed to liquidate the corporation pursuant to section 333; (2) they divided the real property amongst the *65 stockholders, tendered their stock certificates to the corporation, and received deeds to their respective real property holdings prior to January 1, 1974; (3) they agreed at their December, 1973, meeting to postdate all of the documentation to mid January, 1974, when the anhydrous ammonia fertilizer litigation was expected to be completed; (4) they signed various blank and incomplete documents which were subsequently postdated to January 18, 1974, by their attorney; (5) the attorney, acting in concert with Wesley Hipp, kept Hipp Real Estate, Inc., an ongoing corporation and deemed their section 333 liquidation as a mere stock for property exchange without their knowledge or consent; and 6 all of the documentation of such events bearing January 18, 1974, dates merely represent an acknowledgement of an entirely different transaction which actually transpired three weeks earlier. Respondent argues that the documents speak for themselves and that petitioners' extrinsic evidence to the contrary is barred by the parol evidence rule. Both parties offer conflicting interpretations of the applicability and effect of the parol evidence and related "third-party to the instrument" rules. *66 Application of these rules in Tax Court proceedings is often difficult. In the instant case, it would normally involve an analysis of Arkansas' substantive law regarding the admissibility of extrinsic evidence because we are confronted with an issue pertaining to the existence of legal rights and interests created by a written instrument, i.e., the date and nature of petitioners' cessation of ownership in Hipp Real Estate, Inc. Estate of Craft v. Commissioner,68 T.C. 249, 259-264 (1977), affd. per curiam 608 F.2d 240 (5th Cir. 1979). We need not, however, delve into this morass because, even if we admit petitioners' oral testimony which directly contradicts all of the attendant documentation, we hold that they have failed to overcome the presumptive correctness of the Commissioner's determinations that a stock for property exchange occurred in January, 1974. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
Hipp Real Estate, Inc.'s Federal corporate tax return for its 1974 taxable year reports a $23,723.61 loss resulting from petitioners' exchange of their stock for land. Its *67 tax return for the 1973 taxable year, which was filed within one month of the alleged December, 1973, transaction, makes no mention of the event. The corporation's detailed inventories of its real property holdings, which are prepared at the end of each year, also do not report a reduction of over 8,000 acres during the 1973 calendar year. Further, in 1978, when petitioner Juel Hipp employed two of his expert witnesses to appraise the distributed lands, he specifically requested a January 18, 1974, valuation date. All of the attendant documentation to these exchanges, with the exception of one instrument, contain a January 18, 1974, date. The only nonconforming document is petitioner J. A. Hipp's stock certificate which bears an even later date. There also is no demonstrative evidence of any contemplated section 333 transaction. Hipp Real Estate, Inc.'s minutes of its special meeting of its stockholders, directors and officers, which is signed by petitioners J. A. and Juel Hipp, specifically reference a stock for property exchange by only these petitioners. There is no discussion of any contemplated section 333 liquidation. There was no filing of the required shareholder elections. *68 Sec. 1.333-3, Income Tax Regs.The corporation also failed to file the required information returns pertaining to a liquidation. Sec. 1.6043-1, Income Tax Regs. The failure of Wesley Hipp to tender his stock along with petitioners in exchange for their respective real property interests is also totally inconsistent with a contemplated section 333 liquidation. Finally, the fact that Hipp Real Estate, Inc., was an ongoing corporation which owned over 4,000 acres of real property at the time of trial is inconsistent with a complete liquidation that was to have occurred over seven years earlier. Petitioners' oral evidence and lack thereof is equally unsupportive of their contentions. If both the attorney who supervised these exchanges and the attending notary public actually postdated all of the documentation to a subsequent year, petitioners should have utilized their testimony at trial, under the penalties of perjury, to establish that fact. The same can be said with respect to petitioners' claims that the supervising attorney transformed a contemplated section 333 nontaxable liquidation into a taxable stock for property exchange. *69 Petitioners, however, did not call either individual as a witness and offered no explanation for their absence at trial; hence, it is appropriate for us to draw the inference that their testimony would not have been supportive of petitioners' position. Wichita Term. El. Co. v. Commissioner,162 F.2d 513, 515 (10th Cir. 1947). Finally, petitioners' witnesses' admission of their cooperation in postdating documents to a subsequent taxable year, thus deferring petitioners' tax liabilities, does little to bolster their credibility. After observing their demeanor while testifying, we afford little weight to such testimony. Therefore, we hold that petitioners have failed to carry the burden of proof placed upon them by Rule 142(a), Tax Court Rules of Practice and Procedure. Accordingly, the Commissioner's determinations tha stock for property exchanges occurred on January 18, 1974, are sustained. A related issue to the preceding discussions concerns the characterization and tax consequences of the real property distributions to petitioners. Petitioners initially alleged that the events should still be deemed a section 333 liquidation. Respondent contends that the *70 distributions should be taxed pursuant to sections 301 and 302. Given that Hipp Real Estate, Inc., has not been completely liquidated and our finding that petitioners engaged in a stock for property exchange on January 18, 1974, we generally agree with respondent's positions. We start by treating petitioners' trading of their stock in Hipp Real Estate, Inc., for its real property as a redemption of their stock. Sec. 317(b).Section 302(b) provides several methods by which redemptions may qualify as exchanges. Hipp Real Estate, Inc.'s redemption of petitioner Juel Hipp's stock qualifies as a complete termination of his interest in the corporation pursuant to section 302(b)(3). The redemption terminated his actual ownership of any stock in Hipp Real Estate, Inc. No additional shares can be attributed to him by virtue of section 302(c), which incorporates the family attribution rules of section 318. After the redemptions of petitioners J. A. Hipp and Juel Hipp's stock on January 18, 1974, all of the outstanding stock in Hipp Real Estate, Inc., was owned by Wesley Hipp and there is no brother-to-brother attribution. Sec. 318(a)(1)(A). Hipp Real Estate, Inc.'s redemption of petitioner *71 J. A. Hipp's stock, however, fails to qualify under any of the provisions of section 302(b) in effect for his 1974 taxable year. There was no complete termination of the petitioner's interest within the purview of section 302(b)(3) because Wesley Hipp's 100-percent ownership of the corporation after the exchanges is constructively attributed to him pursuant to section 318(a)(1)(A)(ii). Petitioner J. A. Hipp has not filed any waiver of the family ownership rules to date in accordance with section 302(c)(2)(A) and we have held that substantial compliance with such filing requirements is mandatory. Robin Haft Trust v. Commissioner,61 T.C. 398, 405-406 (1973), vacated on another issue 510 F.2d 43 (1st Cir. 1975). Further, the "safe harbor" of section 302(b)(2), which entails a substantially disproportionate redemption of stock, is equally inapplicable due to the attribution of Wesley Hipp's stock ownership to petitioner J. A. Hipp. Sec. 318(a)(1)(A)(ii). Finally, the "not essentially equivalent to a dividend" test of section 302(b)(1) is not satisfied.In United States v. Davis,397 U.S. 301, 313 (1970), the Court held, inter alia, *72 that the constructive ownership rules of section 318 apply to dividend equivalency determinations under section 302(b)(1) and that to avoid dividend equivalency, the redemption must result in a "meaningful reduction of the shareholder's proportionate interest in the corporation." In the instant case, by virtue of the constructive ownership rule of section 318(a)(1)(A)(ii), petitioner J. A. Hipp is still deemed to be the owner of Wesley Hipp's 100-percent interest in the corporation after the exchange; hence, there has been no reduction of petitioner's proportionate interest in the corporation.
Section 302(d) provides that, if a corporation's redemption of stock is not governed by section 302(a), then the "redemption shall be treated as a distribution of property to which section 301 applies." Applying section 301(c) to the distribution of real property to petitioner J. A. Hipp, no portion of the distribution constitutes a dividend because Hipp Real Estate, Inc., did not have any current or accumulated *73 earnings and profits at the time of the distribution. Therefore, the amount of the distribution to petitioner J. A. Hipp shall first reduce his basis in the stock. Sec. 301(c)(2). The basis for such calculations shall be the amount utilized in the notice of deficiency mailed to petitioner J. A. Hipp, as he has not assigned error in his petition, briefs, or at trial with respect to such amount.Welch v. Ehlvering,supra; Rule 34(b)(4), Tax Court Rues of Practice and Procedure. Any excess of the amount of the distribution to petitioner J. A. Hipp beyond such basis shall be treated as the gain from the sale or exchange of the stock acquired by petitioner on December 27, 1973. Sec. 301(c)(3)(A). Issue 3. Fair Market Value of Distributions on January 18, 1974
The next issue concerns the amount of distributions made by Hipp Real Estate, Inc., upon redemption of petitioners' stock on January 18, 1974.Since the distributions to petitioners are deemed "exchanges" pursuant to sections 301(c)(3)(A) and 302(a), the amount realized on such exchanges shall be "the sum of any money received plus the fair market value of the property (other than money) received." Sec. 1001(b). *74 Both petitioners presented their own expert witnesses concerning the respective values of the properties received. Petitioner Juel Hipp utilized three expert witnesses. His first expert witness, Wesley Adams, was a real estate appraiser who was employed in late 1978 to value the real property as of January 18, 1974. Mr. Adams toured the subject properties, examined topographic maps of the areas, and investigated comparable land sales. He also divided the Hipp properties into three general categories: extremely steep mountain sides, cliffs and bluffs; steep mountain sides; and gently rolling to moderately steep land. Based upon comparable sales of land in each of these categories and taking into consideration the harvestible timber thereon, he estimated the fair market value of the 4,192.41 acres of land (he inadvertently omitted approximately six acres) received by Juel Hipp to be $230,000 as of January 18, 1974, or an average of approximately $55 per acre. He admitted upon cross-examination, however, that comparable property was selling at approximately $62.50 per acre during the relevant period. Petitioner Juel Hipp's next expert witness was David Miller, who was both *75 an abstracter and real estate salesman. Mr. Miller was employed in the spring of 1978 to render an opinion of the fair market value of the lands on January 18, 1974. Mr. Miller also toured the subject properties, examined topographic maps and investigated comparable land sales. Mr. Miller's analysis did not integrate any timber values based upon a belief that the properties as a whole were not suitable for timber harvesting. Mr. Miller estimated that the fair market value of 4,074.41 acres owned by petitioner Juel Hipp (Mr. Miller's appraisal did not include approximately 124 acres located in Independence County) was $224,092.55 as of January 18, 1974, which also is an average of approximately $55 per acre. He admitted during cross-examination that comparable properties were selling for between $62.50 and $75 per acre during the relevant period. Petitioner Juel Hipp's final expert witness was a real estate broker, Arthur Gay. Mr. Gay was employed in January, 1978, to render his opinion of the fair market value of the subject properties as of January 1, 1974. Mr. Gay inspected the subject properties, examined topographic maps and investigated comparable land sales. Based upon *76 such information and taking into consideration the harvestible timber located on such lands, Mr. Gay determined that the subject properties were collectively worth an average of $42.50 per acre or a total of $178,432.85 (multiplying by 4,198.42 acres). He also admitted during cross-examination, however, that comparable real property was selling for $62.50 per acre during the relevant period. Petitioner J. A. Hipp relied upon one expert witness concerning the valuation of his distributed lands. Glen Buercklin, a real estate broker, was employed to value approximately 4,007 acres of land owned by petitioner J. A. Hipp [6] as of approximately January 1, 1974. Mr. Buercklin toured about 50 percent of the lands, examined topographic maps, and investigated comparable land sales. Based upon such information, Mr. Buercklin estimated that the fair market value of the 4,007 acres he appraised was $164,100 on approximately January 1, 1974, which is an average of about $41 per acre. Respondent utilized two expert witnesses *77 in presenting its valuation evidence. Its first witness was Stewart Allen, who was employed by the Internal Revenue Service as a forester when he prepared his valuations. Mr. Allen toured the subject properties, examined topographic maps of the areas, conducted a modified line timber plot cruise on the properties (as discussed herein), and investigated comparable sales.His appraisals contained two relatively independent analyses: summation of the assets and comparable sales. The summation of the assets approach entailed the following: an appraisal of the raw land (excluding any timber growth thereon) and a valuation of its existing timber utilizing a modified line timber plot cruise. The modified line timber plot cruise involved randomly selecting various points throughout the subject properties, estimating the timber within a 52.7 foot radius of such points and valuing it based upon recent sale prices, and extrapolating values of all of the timber on such tracts from measurements taken within the circular plots.These measurements included amounts of softwood and hardwood saw timber and pulpwood, site indexes, and soil quality. Based upon these procedures, Mr. Allen determined *78 that the fair market value of all o the real property on January 18, 1974, was an average of $137.07 per acre pursuant to the summation of assets method and an average of $135 per acre under the comparable sales approach. Mr. Allen, however, was unable to substantiate his initial raw land values and wood product prices utilized in his summation of the assets approach. Mr. Allen's analysis of the value of timber on such lands also failed to adequately integrate accessibility problems associated with harvesting the wood. Although isolated stands of commercially operable timber may exist on remote lands, lack of access due to terrain conditions significantly reduces their value. Further, the vast majority of the subject tracts, unlike many of the parcels used as comparable sales, do not contain commercially operable amounts of timber.Finally, many of Mr. Allen's comparable sales involved real property tracts which, unlike petitioners' lands, had been scientifically managed to produce higher timber yields or had high site indexes, thus warranting a higher value. Respondent's remaining expert valuation witness was David Smith who was also employed by the Internal Revenue Service *79 as a forester. Mr. Smith prepared several valuation reports concerning the subject properties. Mr. Smith's first appraisal, which was prepared in February, 1979, concerned only the real property distributed to petitioner Juel Hipp and was primarily based upon Mr. Allen's and Mr. Adam's valuation reports. Mr. Smith initially assigned an average value of $100 per acre as of January 18, 1974, to the 4,198.42 acres received by petitioner Juel Hipp. In March, 1979, Mr. Smith valued the property petitioner J. A. Hipp later disposed of as gifts on November 17, 1975. Relying upon his February, 1979, appraisal of petitioner Juel Hipp's land, Mr. Smith determined the collective value of this property, which was subsequently given as gifts, to be an average of $125 per acre due to a 25-percent inflation adjustment for the intervening 22-month period. In October, 1981, Mr. Smith valued the real property distributions to petitioners J. A. and Juel Hipp as of January 18, 1974, and the property petitioner J. A. Hipp disposed of by gift as of November 17, 1975. For Mr. Smith's final report, he reviewed the appraisals prepared by Mr. Allen, Mr. Adams, Mr. Miller, and Mr. Gay and briefly inspected *80 both the subject properties and comparable utilized in the others' reports.He determined that the real property distributed by Hipp Real Estate, Inc., had an average fair market value of $135 per acre on January 18, 1974, and that a 12-percent inflation rate dictated that the property disposed of by gift by petitioner J. A. Hipp had an average collective value of $165 per acre on November 17, 1975. Given Mr. Smith's extensive reliance on the appraisal reports of others when he prepared all of his distribution valuations and his failure to inspect the subject properties in detail, the independence and accuracy of his valuations is in doubt. After considering the appraisal reports and testimony of the parties' witnesses, we find that the average value of the 4,198.42 and 4,102.43 acres of real property distributed to petitioners Juel Hipp and J. A. Hipp, respectively, on January 18, 1974, was $65 per acre. Therefore, the fair market value on January 18, 1974, of the distributions to petitioners Juel Hipp and J. A. Hipp, was $272,897.30 and $266,657.95, respectively. Issue 4. Fair Market Value of Gifts
The final issue concerns the value of the real property given as gifts *81 by petitioner J. A. Hipp to his children on November 17, 1975. All of the lands given as gifts were distributed to this petitioner by Hipp Real Estate, Inc., on January 18, 1974. Petitioner utilized a price of $35 per acre when valuing the gifts he made to his children despite the fact that he had agreed such lands were worth approximately $45 per acre when he sold his interests in the three family corporations in October, 1973. Respondent contends that the real property is collectively worth an average of $125 per acre. The appraisals of the parties' expert witnesses are discussed in the preceding issue pertaining to the value of the real property distributions occurring on January 18, 1974. We add, however, that petitioner J. A. Hipp's expert witness, Glen Buercklin, appraised the J. A. Hipp property only as of approximately January 1, 1974, and made no other valuation of the subject properties as of November 17, 1975.
Section 2512(a) provides that, for gift tax purposes, the value of the property transferred shall be determined as of the date of the gift. Each gift must be valued *82 separately. Rushton v. Commissioner,60 T.C. 272, 278 (1973), affd. 498 F.2d 88 (5th Cir. 1974).Although the Commissioner did not value petitioner's gifts separately, this error is largely academic in that we find that petitioners' expert witnesses were more convincing to us. In the preceding discussions, we found that the real property distributed to petitioner J. A. Hipp in redemption of his stock in Hipp Real Estate, Inc., part of which comprises the subject gifts, had an average fair market vaue of $65 per acre as of January 18, 1974. Petitioner J. A. Hipp's expert witness, Glen Buercklin, noted that real property prices in the subject area began escalating in 1975 and 1976. Respondent contends that some price adjustment for inflation and market conditions is warranted for the 22-month interval between Hipp Real Estate, Inc.'s distribution to petitioner and petitioner's gift of some of the distributed lands to his children. After reviewing the appraisal reports of the parties' expert witnesses, considering their testimony, and analyzing all of the other relevant evidence, we find that a $5 per acre adjustment to our previous January 18, 1974, valuation *83 is necessary to reflect the real property's fair market value as of November 17, 1975. Accordingly, we find that the real property which was given to petitioner's children had an average fair market value of $70 per acre on November 17, 1975. Applying this value to the gifts made by petitioner, the fair market values of gifts received by the respective donees is as follows: Donee
Value
William L. and Vaneta M. Allen
$81,823
as tenants-by-the-entirety
Paskle Dean Davis
84,994
Glynn A. Hipp
84,000
Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners were consolidated herewith for trial and opinion: Juel C. Hipp and Audra M. Hipp, docket No. 3884-79; J. A. Hipp, docket No. 14083-79.↩
2. Petitioner Audra M. Hipp is a party herein solely as the result of her filing a joint Federal income tax return with her husband. She was not personally involved in any of the events in issue; hence, for purposes of simplicity, we will refer only to petitioner Juel C. Hipp when discussing this couple's tax liabilities.↩
3. All section references are to the Internal Revenue Code of 1954, as amended, applicable to the taxable years in issue.↩
4. This figure was designated on the return as a loss resulting from shareholders' exchanges of stock for land. The date of this exchange and its attendant tax consequences are in issue in the immediate proceedings.↩
5. For a discussion of the distinction between "agency" cases and "disregard" cases, see generally Miller, "The Nominee Conundrum: The Live Dummy is Dead, but the Dead Dummy Should Live," 34 Tax L. Rev. 213 (1979); Kronovet, "Straw Corporations: When Will They be Recognized; What Can and Should be Done." 39 J. Tax. 54↩ (1973).
6. There is no explanation concerning the disparity between the number of acres Mr. Buercklin appraised and the total amount distributed to petitioner J. A. Hipp.↩